Ross WITHERS, Appellant,

v.

Guy PETTIT and Berlough McCluey, Individuals and As Partners d/b/a McCluey & Pettit Broom Works, Respondents.

No. 47864.

Supreme Court of Missouri.

Division No. 1.

July 11, 1960.

Gordon R. Boyer, Lamar, Al Mendelson, Kansas City, for appellant.

Combs & Combs, J. Carrol Combs, Clyde E. Combs, Lamar, for respondents.

WESTHUES, Presiding Judge.

On the morning of April 10, 1958, at about 10 o'clock, plaintiff Ross Withers and five other men were riding in a station wagon going north on Highway No. 71. When they reached a point about a mile south of Harrisonville, Withers, the driver, stopped the station wagon to permit a truck, also heading north, to make a right turn onto a side road. About the time the station wagon came to a stop or a second or two thereafter, defendants' truck also going north (with defendant Pettit driving) collided with the rear of the station wagon which in turn "bumped" the small truck which had stopped to let a large truck turn off the road. Withers filed this suit against Guy Pettit and Berlough McCluey, as partners, asking damages in the sum of $15,200 for personal injuries and damages to the station wagon. A trial in the Circuit Court of Barton County at Lamar, Missouri, resulted in a verdict for the defendants. Plaintiff appealed to this court.

Plaintiff, on this appeal, has briefed three points. The first has to do with an instruction (D), given on behalf of the defendants. This instruction submitted to the jury defendants' theory that the station wagon came to a sudden stop so that defendant Pettit was unable to avoid a collision. Plaintiff says that the instruction misstated the law and that there was no evidence of a sudden stop. In the other two assignments of error, plaintiff says, in substance, that the trial court erred in failing to grant him a new trial because the evidence showed that defendant Pettit was grossly negligent and the verdict was "flagrantly" against the law and the evidence.

According to the record, there were four motor vehicles (which had a bearing on the collision) going north on Highway 71 at the time in question. In the lead was a large truck; next was a pickup truck operated by John H. Raynes who testified for plaintiff. Following the Raynes truck was the station wagon occupied by plaintiff and his companions; then came defendants' truck. Highway 71 at that point is a much traveled road. It is a hard, bituminous surface road with shoulders on each side. The topography of the land there may be termed as rolling. From the crest of a hill to the point of collision, it is downgrade and the distance was estimated to be about 300 feet.

John H. Raynes was plaintiff's first witness. He testified that the truck ahead of him slowed down and turned into a driveway leading to a junk yard to the right of the highway. Note the evidence of this witness as to what occurred:

"Q. What did you do when you saw him stopping? A. I hit my brakes.

"Q. How did you stop, John, was it a slow stop or did you have to stop pretty fast? A. We all had to stop pretty fast.

"Q. You had to stop pretty fast—he didn't give you much warning, is that right? A. That's right.

"Q. Then you had to put on your brakes and stop to avoid hitting the truck turning in? A. Yes.

"Q. You have no knowledge of the accident between the station wagon of the plaintiff, Mr. Withers, and the defendant? A. No. I just give them my name and told them how to get in touch with me.

"Q. What damage did you say was done to the rear of your truck? A. There wasn't no damage.

"Q. No damage? A. No.

"Q. How was that impact, was it hard or what? A. No. Just like I say, just, you might say like a fly lighting on your back."

Raynes further testified that a rain had fallen that morning and the roadway at the time of the collision was damp.

Plaintiff and his companions testified that there was no rain on that day and the roadway was dry. The testimony of plaintiff's passengers as to the collision was in agreement with that given by plaintiff. His version of what occurred was as follows:

"Q. Mr. Withers, tell the court and jury please in your own words just what took place from then on to the point of the impact and collision? A. Well, I went up 71 Highway about, oh, 35 miles an hour. I got to the crest of the hill. I saw Mr. Pettit, I mean, I saw a truck pulling off into the automobile wrecking yard on the east side of the highway and I saw this pickup truck stop behind it. I was going about 35 miles an hour and I went about 250 feet from the crest of the hill and I saw them standing there so I applied my brakes and stopped in about 50 feet.

"Q. How far back of the pickup truck did you bring your car to a stop? A. About 10 or 12 feet.

"Q. That pickup truck was the truck driven by Mr. Raynes who testified here this morning? A. That's right.

\*   \*   \*   \*   \*   \*

"Q. How long had it been standing there before Mr. Pettit's truck ran into the back of it? A. Mine?

"Q. Yes. A. About 10 seconds, 10 or 12 seconds.

"Q. Did you have to make a sudden stop? A. No, sir.

\*   \*   \*   \*   \*   \*

"Q. What was the first warning you had that the collision was about to take place? A. We heard the tires squeaking.

"Q. You heard the tires squeak and then what? A. The thud and a good bump.

"Q. What happened when the bump occurred? A. Well, my neck went back and I had a pain in my neck after it was over?

"Q. What happened to the car that you were in? A. Well the back bumper had to be replaced. The back door, the hinged door that lays down had to be straightened. Both fenders were split."

Sergeant Shelton F. Abney of the Highway Patrol arrived upon the scene a few minutes after the collision. He testified that there were skid marks on the roadway for a distance of about 72 feet. It was conceded that these marks were made by defendants' truck. The patrolman further testified that the defendant Pettit made the following statement at the scene of the collision: " 'The first thing I noticed they had all stopped and I didn't get stopped. I saw the stop lights come on, on the car in front of me but didn't see the truck give a signal.' " He quoted Mr. Pettit as saying that he had been driving at about 30 miles per hour.

Plaintiff introduced a part of a deposition of the defendant Pettit as admissions against interest. In this deposition, Pettit testified as follows:·

"'Q. How much distance separated the back of Mr. Withers' vehicle from the front of your truck the first time you saw him? A. Oh, I judge a hundred and fifty or two hundred feet.

"'Q. What was your speed at that point? A. About 30 to 35.

"'Q. What was his speed at that point? A. Practically stopped, slowing so he was practically at a standstill when I first seen him.

"'Q. Was the vehicle ahead of Mr. Withers' station wagon a Harrisonville Hardware Company truck? A. Yes.

\* \* \* \* \* \*

"'Q. Would you say then that the station wagon your truck came in contact with was standing still at the time of the impact? A. Yes.

"'Q. How long had it been standing still before the impact occurred? A. It was just barely moving when I came in sight of it, so I'd say a minute or two, or whatever time it takes to go down that hill. \* \* \*'"

There was evidence that at the time of the collision there were vehicles going south on Highway 71 and other evidence that there was no southbound traffic at the time or immediately before the collision.

The defendant Pettit testified at the trial as follows:

"Q. What happened that morning when you went over this hill—just describe it to the jury if you will? A. Well, as I went over the hill at the second crest I noticed cars on my side of the road ahead of me, one of them looked to be a flatbed truck, a ton and a half or two ton, and the other one was a pickup and a station wagon. I couldn't tell how close they were together but they were all traveling down the slope.

\* \* \* \* \* \*

"Q. As you proceeded on down the hill then what happened? A. I noticed the cars ahead of me were gradually slowing and not knowing what they were slowing for I only let my motor pull me down in second gear for a ways.

"Q. Then what happened? A. Then I noticed the brakes had been applied and the lights showed up and I throwed my brakes on.

"Q. What happened then? A. They stopped and blocked the highway and I skidded in and bumped them.

"Q. At that time was there any traffic coming from the north? A. Yes. I was sliding and I looked to the right and no shoulder and I looked to the left and traffic was coming \* \* \*

"Describe to the jury if you will, Mr. Pettit, the condition of the shoulders at the point of the accident, where it occurred? A. The shoulder only measures three foot at the impact."

The defendant Pettit stated that he was driving a small truck loaded with 1800 lbs. of brooms; that the truck was in good mechanical condition. On cross-examination, he gave the following testimony:

"Q. You saw this traffic in front of you about a city block ahead of you? A. As I come over the rise about 300 feet, yes.

"Q. You knew they were stopping? A. I could see they were slowing, I didn't know anything about their stoping.

\* \* \* \* \* \*

"Q. Why didn't you apply your brakes full power 200 feet back? A. Well I only lacked just about 10 feet of doing so.

"Q. I understand but if you had applied them back 200 feet you would have stopped in a lot less than 10 feet? A. I didn't know they was stopping or I would of.

"Q. Then why were you making up your mind about looking for traffic coming toward you in anticipation of going around? A. I noticed my wheels was sliding.

"Q. Two hundred feet back? A. Around that—190, 180 feet."

The above statement of facts is sufficient for a determination of the points briefed by plaintiff-appellant.

Instruction D, which plaintiff says the court erred in giving, reads: "The court instructs the jury that if you find and believe from the evidence that the plaintiff brought his said automobile to a sudden and abrupt stop and that the defendant Pettit thereafter could not, by the exercise of the highest degree of care, have stopped his said motor truck, turned the same aside, and thus and thereby have avoided striking the automobile which the plaintiff was then and there operating, then your verdict must be for the defendants, providing you further find that the defendant Pettit was not negligent in any way in the operation of defendants' said motor truck."

Plaintiff, in his "Points Relied On," says, "The Court erred in giving defendants' instruction D because this instruction failed to hypothesize all of the facts and told the jury they should hold defendants blameless if plaintiff's car made a sudden and abrupt stop and defendants could not avoid the accident, and this was contradictory since there was no testimony of a sudden stop and the Court had already told the jury in Plaintiff's Instruction No. 1, that it was the duty of the defendant driver following plaintiff's car, to keep a lookout and observe the movements of the car ahead and to keep a sufficient distance behind to avoid a rear end collision."

It is obvious, as may be noted from the above statement of facts, that there is no merit in the contention that "there was no testimony of a sudden stop." Aside from the defendants' evidence, which we need not consider under this point, plaintiff's first witness testified that when he noticed the truck ahead was going to slow down and make a turn, "We all had to stop pretty fast." Note what this witness said on redirect examination by plaintiff's counsel:

"Q. One final question. You didn't have any trouble getting stopped that day, did you, Mr. Raynes? A. No, not a whole lot other than having to stop fast.

"Q. You didn't hit the car ahead of you? A. No.

"Q. In what distance did you stop your car that day? A. I have no idea."

The point must be ruled against plaintiff.

Our interpretation of plaintiff's other point made in the assignment quoted supra is that he contends that the trial court, by instruction No. 1, advised the jury that it was the absolute duty of the defendant to avoid colliding with the rear of plaintiff's car; that by instruction D the jury was advised that defendants should be held blameless "if plaintiff's car made a sudden and abrupt stop and defendants could not avoid the accident." Plaintiff says these instructions were contradictory and therefore it was error to give instruction D. To illustrate plaintiff's theory further, we quote the following from his brief: "Defendants' instruction D then told the jury that if they found plaintiff brought his automobile to a sudden and abrupt stop (and there is not one iota of evidence of a sudden and abrupt stop) and defendant couldn't have stopped his truck or turned to the side, then defendant must be absolved of liability. Defendants' instruction was not a converse instruction it was a direct misstatement of the law set forth

in the Terrell case and in effect told the jury just the opposite of what the court had told them in instruction number 1. The law makes it the duty of the following driver to avoid an accident in the event of a sudden stop in front. The defendants' instruction attempts to tell them that even though the defendant must avoid an accident under all circumstances, if he cannot avoid it, defendant was blameless."

The Terrell case referred to was decided by Division One of this court in February, 1950. See Terrell v. McKnight, 360 Mo. 19, 226 S.W.2d 714. The plaintiff in that case sought damages for personal injuries sustained when his car collided with the rear of the defendant's truck which had slowed down to make a turn off the roadway. Plaintiff contended that defendant gave no notice of his intention to turn and for that reason plaintiff was unable to avoid a collision. A trial resulted in a verdict for the defendant. On appeal, one of plaintiff's assignments of error was the giving of defendant's instruction D. See 226 S.W.2d loc. cit. 717(3), where instruction D is quoted in full. In considering the correctness of the instruction, the court referred to the case of Christman v. Reichholdt, Mo.App., 150 S.W.2d 527, loc. cit. 531, with the comment that, in that case, "Similar objections were made to that instruction as are here made to instruction D, and were overruled by the St. Louis Court of Appeals in a well-reasoned opinion supported by abundant authority." It is obvious that this court approved the ruling in the Christman case on this point. In the Christman case, the court of appeals had before it a situation similar to the case before this court in the Terrell case. The plaintiff sought damages from the defendant on the theory that the defendant had made a sudden stop so that plaintiff in a car following defendant's car was unable to avoid a collision. In the Christman case, 150 S.W.2d loc. cit. 531(3), the court considered an instruction which submitted to the jury plaintiff's alleged contributory negligence. It may be noted that the first paragraph of that instruction was an abstract statement of law as to the plaintiff's duty as the driver of a car following defendant's car. In the next paragraph of the instruction, the jury was advised that if the plaintiff did not exercise the highest degree of care and failed in certain respects, as set forth in the instruction, then and in that event, the jury could find that plaintiff was contributorily negligent. There is no doubt that if instruction D in the Christman case had contained only the first paragraph, that is, the abstract statement of law, the instruction would have been held to be improper. Note what the court of appeals said, 150 S.W.2d loc. cit. 532(6–8): "It is, of course, true that it is improper to give an instruction announcing a rule of law, however correct it may be, unless it is connected with the issues involved. * * * The abstract statement of law complained of by appellant is followed by a charge defining the issues and requiring findings of fact which justify the application of the law declared."

This court, in Jones v. Rash, Mo., 306 S.W.2d 488, loc. cit. 493(7, 8), approved the above declaration of law. Plaintiff cited Jones v. Rash in support of his contention. He contends that this court approved instruction No. 8, given in the Rash case. Without setting forth the elements of instruction 8 in that case, we call attention to what Judge Storckman, the author of the opinion, said about instruction 8, 306 S.W.2d loc. cit. 494(11): "Instruction 8 has weaknesses and is vulnerable to the criticism made as well as others. While prejudicial error has not been shown in this instance, the instruction rests upon unsafe ground and it should be radically redrafted in order to avoid the possibility of its being held to constitute prejudicial error in other circumstances." See also the case of Jones v. Central States Oil Co., 350 Mo. 91, 164 S.W.2d 914, where this court held that to authorize a verdict for a plaintiff in a rear end collision case, there must be a finding of negligence or a

finding of facts which amount to negligence as a matter of law.

■■ It is our opinion that the rule of law established in this state, and as announced in the cases reviewed supra, is that a driver of a car colliding with the rear of a car ahead of him on a public roadway can only be held liable on the theory that he has failed to exercise the highest degree of care. Plaintiff's instruction in this case submitted to a jury his case on that theory. The instruction advised the jury that it was defendants' duty to avoid a collision in case plaintiff made a sudden stop. Plaintiff's instruction further hypothesized facts which, if found by the jury, would justify a verdict for plaintiff in case defendant Pettit failed to exercise the highest degree of care in failing to stop or turn his truck aside and thereby avoid a collision. Instruction D conversely informed the jury that if defendant Pettit was not in the exercise of the highest degree of care able to stop or turn aside in time to avoid a collision and was not negligent in any way, then the jury should find for the defendants. The contested issues were fairly submitted to a jury and the jury found for the defendants. Carny v. Stuart, Mo., 331 S.W.2d 558, loc. cit 561(1–3).

■ It is unnecessary to consider at length the other two assignments of error. In substance, they present no more than that the trial court should have given plaintiff a new trial for the reason that the verdict of the jury was against the weight of the evidence. The trial court refused to do so and under the evidence this court cannot say that the trial court's action was an abuse of discretion. Beezley v. Spiva, Mo., 313 S.W.2d 691, loc. cit. 695, 696(6–8); Siegel v. Ellis, Mo., 288 S.W.2d 932, loc. cit. 934(1, 2).

The judgment is hereby affirmed.

All concur.