CLAIRE ADAMS, Executor of Estate of Jim Adams, and
J. L. ADAMS, Appellant,

*v.*

VIRGINIA ADAMS UNDERWOOD, Claimant-Appellee.

470 S.W.2d 180

(*Nashville,* December Term, 1970.)

Opinion filed June 7, 1971.

WILLIAM D. BAIRD, R. DAVID ALLEN, Lebanon, for appellant.

MACFARLAND, REED & KINNARD, Lebanon, for claimant-appellee.

MEMORANDUM

PER CURIAM.

Heretofore, the Court granted certiorari to review the judgment of the Court of Appeals, Middle Division, affirming the judgment of the Wilson County Circuit Court, whereby Virginia Adams Underwood was awarded $5,600.00 for services rendered her father, Jim Adams, in the last sixty-three months of his life. The opinion of the Court of Appeals is as follows:

## "OPINION

"Claire Adams, Executor of the estate of Jim Adams, has appealed from a jury verdict and judgment sustaining the claim of Virginia Adams Underwood for services to the deceased, Jim Adams.

"The claim filed by claimant reads as follows:

'During the sixty-three (63) consecutive months preceding the death of my father, Jim Adams of Lebanon, Wilson County, Tennessee, I did render to him personal services for which I have earned, and am entitled to and have not been paid the amount of Thirty-eight Dollars ($38.00) per week for two hundred seventy-three (273) weeks. The total claim amounting to Ten Thousand Three Hundred Seventy-four ($10,374.00) Dollars.

'During each and every one of these weeks I have cared for my father until his death maintaining a household for him, cooking special meals for him and during the month of his last illness purchasing food and necessities for him when he would not allow a sufficient amount for proper foods and nutrition for

himself. During each of these weeks I waited on him in person by cooking and serving his meals and staying with him as much as was required for his health, comfort, and general well-being.

'At the insistence of my father, Jim Adams, I left my own home with my family and moved into his house for the purpose of giving my father, Jim Adams, proper care during which time my own home has physically deteriorated into a practicably unliveable condition. During much of this time I saw to and took care of the renting of houses and the rental property which my father owned during which time I acted as caretaker for his home and property.'

"The jury returned a verdict in favor of claimant in the amount of $5,600.00, and judgment was entered thereon.

"The first and third assignments of error assert that there was no evidence to support the verdict and that the trial court erred in overruling the motion of the executor for a directed verdict.

"The executor insists that there is no evidence of (a) a contract between claimant and deceased, for payment for services, or (b) any intention of deceased that claimant be paid, or (c) any expectations by claimant of compensation.

"The claimant presented witnesses who testified that, prior to 1963, she resided with her husband and two children on their 100 acre farm near Lebanon, that her husband had been employed for many years at Lebanon Woolen Mills; that she transported him several miles to and from work each day because he did not drive an automobile; that her mother and father lived in Lebanon

near the woolen mills; that, following the death of her mother in 1963, at the request of her brother, J. L. Adams, she discussed and agreed with her father upon a plan whereby her entire family was moved to the home of her father so that she might care for her father; that the father insisted upon living in his own home, but was afraid to live alone; that claimant and her family lived with deceased from 1963 until his death in 1968; that she paid no rent, but their farm home remained vacant; that she drove to the farm every day to care for the livestock; that deceased gave her some money, but not enough to buy his groceries; that claimant cooked special food for deceased according to his prescribed diet; that she cooked special food for his dogs; that she cared for and nursed deceased; that she attended to the collection of rents and repair of the rental property of deceased; that he was physically and mentally incapable of caring for himself or property; and that the reasonable value of her services was $38.00 per week.

"No evidence was offered by the executor.

"Appellant correctly states that there is no evidence of an express contract whereby deceased agreed to pay claimant anything. Nor is there any evidence that deceased ever gave any indication that he intended for claimant to be paid. There is likewise no testimony by claimant that she expected payment.

The issue of law presented here is whether or not special circumstances may create a valid claim for services to deceased, even in the absence of contract, intention to pay or intention to be paid.

"The special and persuasive circumstances of this case are as follows:

"1. Deceased had three children. Only claimant would help him—the others refused.

"2. Deceased was illiterate, senile, lonely, 'just like a child,' physically and mentally unable to attend to his business, would hardly know what he was doing for three weeks at a time.

"3. Claimant furnished deceased the care and nursing which no one else seemed willing to furnish.

"The trial judge charged the jury in part as follows:

'Now, gentlemen of the jury, I charge you that services rendered by a child while living with the parent during the latter's old-age and ill-health, though long continued, are presumed to have been gratuitously rendered from motives of affection and duty. For a child to recover compensation for services rendered the father, she must overcome this presumption by a preponderance of the evidence, showing either a contract, or such exceptional facts and circumstances as to establish an intention on the part of the Claimant to charge and on the part of Decedent to pay for such services notwithstanding the relationship.

'If you find from a preponderance of the proof that the Claimant, Mrs. Underwood, performed the services claimed and Decedent accepted the same under such circumstances that no reasonable man would have supposed Claimant meant to do the work and render the services for nothing, Decedent's estate would be liable to pay for the services. The doing of the work constituted the offer and the permission to do it and the acquiescence in its being done constituted the acceptance. I further charge you that when one renders service to

another with the hope or expectation of a legacy, devise or other provisions by Will without any contract, express or implied, but relying solely upon the generosity of the person for which such services are rendered she cannot recover for such services because of the failure of such person to make testamentary provisions in Claimant's behalf.

'Now gentlemen of the jury, if you find from a preponderance of the proof in this case, that there was a contract, expressed or implied, as heretofore explained to you, between Complainant and Decedent whereby Complainant *wants* to be paid for the services rendered and the Decedent, Jim Adams, failed to carry out such contract agreement, I charge you that Decedent's estate would be liable to Claimant for the reasonable value of the services rendered and your verdict should be in favor of the Complainant if you find that there was an implied contract that she was to be paid for the services she rendered.'

"Under this charge, which was unexcepted to, the jury found for the claimant. Inherent in such a verdict is a finding that the circumstances were such as to imply an obligation to pay.

"In *Gorrell v. Tayior*, 107 Tenn. 468 [568], 64 S.W. 888 (1901), the services were performed by a daughter and her husband who lived with deceased. The court disallowed the claim for services, but stated:

'Children performing services of this character for a parent are presumed to act gratuitously, from motives of affection and duty, and to entitle them to recover compensation therefor, the burden is upon them to overcome the presumption by showing either an

express contract or *such exceptional facts and circumstances as will establish an intention on the one part to charge and on the other to pay*, not withstanding the relationship of kinship. 107 Tenn., p. 570 [64 S.W. 888].' Emphasis supplied.

"In the present case, the claimant was not living with her father until the urgency of his needs and demands required that she abandon her home in order to care for him. Services rendered to a fellow member of a household are in an entirely different category from those which require the sacrifice of a separate abode in order to serve the deceased. The jury evidently found, with cause, that there were 'such exceptional facts and circumstances as will establish an intention on the one part to charge and the other to pay * * *'

"In *Key v. Harris,* 116 Tenn. 161, 92 S.W. 235 (1905) the services were rendered to a sister weak of mind, almost helpless, unable to move from her chair or bed without assistance, as helpless as a baby. It was further shown that, but for the services of the claimant, the deceased would have been a public charge. In said case, the Supreme Court allowed one half of the compensation fixed by the trial court on grounds of ordinary justice and necessities furnished to an incompetent.

"In the present case, there is evidence to support the conclusion by the jury that deceased was physically and mentally unable to care for himself, that other children had refused to care for him, and that, but for the services of claimant, deceased would have been dependent upon the aid of outsiders, which certainly would not have been gratuitous. Thus the verdict of the jury is justifiable upon the theory of necessities furnished. Coincidentally,

in the present case, the jury allowed approximately one-half of the amount claimed.

"In *Cotton v. Roberts Estate*, 47 Tenn.App. 277, 337 S.W.2d 66 (1960), the court denied the claim of a nephew who occupied a house on the farm of deceased and tilled her farm on a crop-sharing basis. Deceased was active, healthy, intelligent and business-like.

"In the present case, there was evidence to show, and the jury evidently found, that the deceased was not as competent and able to care for his affairs as was Mrs. Roberts, supra.

"Appellant urges that claimant herein occupied the home of deceased for five years rent-free; however, during the same period, claimant's own home stood vacant and untended; and claimant thus received no benefit from the use of the home of deceased. She was present there, not to save rent, but to satisfy and serve her father.

"Appellant urges that deceased was reasonably active and managed his own affairs. There is evidence to this effect, but there is also evidence otherwise which the jury evidently believed and followed in its verdict.

"Appellant relies upon a statement from *Key v. Harris*, supra, as follows:

'It is said that the reason underlying the rule is that family life abounds in acts of reciprocal kindness which tend to promote the comfort and convenience of the family, and that the introduction of commercial consideration into the relations of persons so closely bound together would expel this spirit of mutual beneficence and to that extent mar the family unity.

'The reason of the law is the soul of the law. When that fails, the law itself fails.'

"The exclusion of the commercial consideration from cases such as this would enable children who are unmoved by the needs of a parent to shirk all responsibility therefor and place the entire burden upon the only child who will care for the parent and then to demand that estate of the parent be divided equally among the children. This would discourage services to parents by any child unless firm contractual relations were established, and this would, indeed, mar the family relationship.

"The reason of the law is, indeed, the soul of the law, and should not fail. In the present case reason and justice require that there be some difference between the inheritance of the attentive daughter and the inattentive sons. The jury has determined from competent evidence that unusual circumstances exist which justify an inference of contract, or a quasi contract for necessaries. Being supported by material and substantial evidence, the verdict of the jury will not be disturbed. *Kroger Co. v. Giem,* 215 Tenn. 459, 387 S.W.2d 620 (1964); *Clark v. Allison* 58 Tenn.App. 355, 430 S.W.2d 784 (1967) and many other authorities cited in Tenn. Digest, Vol. 2, Appeal and Error, sec. 930(1).

"The second assignment of error that:

'The verdict of the Jury was contrary to the weight and preponderance of the evidence. T.R., P. 11.'

is not proper for consideration in this Court and is respectfully overruled. *Ewing v. Birthright,* 60 Tenn.App. 454, 448 S.W.2d 71 (1969); *Cherry v. Floyd,* 60 Tenn. App. 521, 448 S.W.2d 444 (1969); *Leach v. Leach,* 52 Tenn.App. 606, 376 S.W.2d 739 (1964).

438

"The fourth assignment is that the verdict of the jury is excessive.

"Appellant urges that the rental value of claimant's occupancy of the home of deceased should reduce if not eradicate the claim. The insistence has been dealt with heretofore.

"Appellant urges that the convenience of the home of the deceased to the work of claimant's husband should mitigate the claim. There is evidence that daily trips to the farm were made to attend the livestock which would largely balance the nearness to employment, and the general verdict of the jury for approximately one-half of the claim includes consideration of this factor. Appellant insists, correctly, that claimant has not shown the precise amount she spent for the benefit of deceased or the precise number of hours or minutes she spent in his service, and that the verdict is therefore based upon speculation.

The amount of recovery allowed may not be based upon speculation, but may be, and usually is, based upon estimation.

"In 25A, C.J.S., Damages, sec. 162(2), pp. 80, 81 is found the following:

'Proof of the amount of loss with absolute or mathematical certainty is not required, and it does not matter that the determination of damages depends to some extent on the consideration of contingent events. So, it has been held sufficient if a reasonable basis of computation is afforded, even though the result may be only approximate, or to adduce evidence which is the best the case is susceptible of under the circumstances

and which will permit a reasonably close estimate of the loss. * * *'

"No authority has been cited, and none has been found, which denies to the jury the prerogative of exercising its common sense and common experience in estimating the value of goods and services, especially where the claimant has placed a given value thereon and the jury sees fit to place a lesser value thereon without other testimony. There are areas in which jurors are entitled to call upon their own knowledge and experience which is shared by all reasonably well informed and experienced persons.

"The claim was for $10,374.00 for about five years work at $38.00 per week. Whether the jury found for a lesser period, or for a lesser charge per week, the verdict was for about one half the amount claimed. There is evidence to support the finding of the jury as to the fair amount due, and, upon appeal, the amount of the verdict could hardly be revised without re-weighing the controverted evidence, which action is not within the province of this Court.

"The fourth assignment of error is respectfully overruled.

"Each assignment of error has been overruled for the reasons given. The verdict of the trial jury and the judgment thereon is affirmed. The cause is remanded for further appropriate proceedings. All costs of the cause, including costs of this appeal, are taxed against the appellant-executor.

"Affirmed and Remanded."

440

While this Court is not in disagreement, in general, with this opinion, certiorari was granted because the judgment of the trial court was affirmed in spite of a finding by the Court of Appeals that there was no evidence of contract, whatsoever.

█ If in fact there is no evidence whatsoever of contractual intent, the special circumstances relied on by the Court as justifying the award, being of the same general character as those held to be inadequate for this purpose in *Gorrell v. Taylor*, 107 Tenn. 568, 64 S.W. 888, could not amount to such exceptional facts and circumstances as are contemplated in that case. It is important to note that the "exceptional facts and circumstances" contemplated by *Gorrell v. Taylor*, supra, as adequate to sustain a recovery are not facts which prove the rendition of arduous, valuable services, but facts which will, as the opinion in *Gorrell* states it, "establish an intention on the one part to charge and on the other to pay." p. 570, 64 S.W. p. 88.

So, being concerned that the Court of Appeals opinion would leave the inference that *Gorrell v. Taylor* could be satisfied by the volume of personal services rendered, we granted certiorari: not for the purpose of reversing, but for the purpose of pointing out that the record does contain evidence which tends to show that the arrangement under which Mrs. Underwood rendered services to her father, Jim Adams, was consensual in nature, in that there was a specific request for these services on the one hand and the furnishing thereof on the other, and that this calls into operation a rule which sustains the recovery. We quote from the transcript:

"Q. Now, Mrs. Underwood, do you recall the exact circumstances under which your father first came to live with you in your home?

"A. I went to live with him.

"Q. You went to live in his home?

"A. Yes, sir.

"Q. Do you recall the exact circumstances, though, under which all of this began?

"A. Well, the first thing, J. L. called us, out on the farm, and he said my Daddy wanted to see us, and I said what was the matter, and he said he was wanting to see us about coming to live with him and take care of him, and he said for us to come up there—he'd meet us a certain time, and so we got ready and my husband and I went up there, and J. brought my Daddy over there and met us, and we talked a little *and he said he wanted to see us about coming to live with him,* that he did not * * *

"MR. BAIRD: If Your Honor please, we except to any statements that * *

"COURT: Who was there when this was going on now?

"A. J. L. called me on the telephone, out on the farm, and I think I talked to my Daddy.

"MR. KINNARD: Your Honor, I believe both of these men are party defendants to the suit, and * * *.

"COURT: Were they present?

"MR. KINNARD: I think she can say what J. L. Adams said.

"MR. BAIRD: I'm not objecting to what J. L. said—I'm objecting to what her father said over there * * *

"COURT: Well, she can't tell us what her father said, or a transaction with the deceased—she can't tell about that.

"MR. KINNARD: I thought Mr. Baird was excepting to what J. * * *.

"COURT: No, she can tell what J. L. said and what Claire said, or any understanding or transaction she had with them, but * * *

"WITNESS: I can't say nothing that my Daddy said?

"MR. KINNARD: No, ma'am, we can't admit statements that your father made.

"A. Well, J. L. called me to come up there, my husband and myself, and we went up there and he left us with my father and went off and told us when he would come back and he came back and got us * * * if I can't say nothing my Daddy said.

*　　*　　*　　*　　*　　*　　*

### Cross-Examination

"Q. You said that J. L. called you on the telephone and wanted you and your husband to come up there to talk with your father, that's right, isn't it?

"A. That is right, he called me and then I talked to my father.

"Q. And then you came up there?

"A. That is correct—*he wanted us to come stay with him.*"

This testimony together with other testimony in the case shows that Mrs. Underwood left her own home and entered the home of her father, not to reestablish a family relationship, but to render services according to a pre-arrangement. Under such circumstances, a number of respectable courts hold that the presumption of gratuity is either done away with, or loses its full force and effect. In *Mathias v. Tingey*, 39 Utah 561, 118 P. 781, 38 L.R.A., N.S., 749, it was held that an adult child who was no longer a member of the parent's family but was supporting himself through his own efforts, who returned to his parent's home at the parent's request to perform certain services for the parent would not be prevented from recovering by the gratuity presumption, which would lose its full force and effect in such a case.

In *Cramer v. Clark*, 121 Wash. 507, 209 P. 688, 24 A.L.R. 970, it is said:

"The ordinary presumption that services when rendered are in expectation of payment is not rebutted (referring to the case sub judice) by the mere fact that the parties to the transaction stood in the relation of parent and child. The courts make a distinction between cases where the child has become of age, been away from home and then returned on the request of the parent, and one where the child has continued to live with the parent after arriving at age. Where the child has established a separate abode, the presumption that services performed by him for the parent are gratuitous no longer prevails". (Parenthesis added)

This same proposition is exemplified by the holdings in *Marietta v. Marietta*, 90 Iowa 201, 57 N.W. 708; *Mar-*

*key v. Brewster,* 10 Hun 16, affirmed 70 N.Y. 607; *Freeman v. Freeman,* 65 Ill. 106; *Patterson v. Rehfuss,* 250 Ala. 508, 35 So.2d 330.

Cases related in effect to this proposition which it may be of benefit to read are *Estate of Grossman,* 250 Wis. 457, 27 N.W.2d 365, and *Wilsey v. Franklin,* 57 Hun 382, 10 N.Y.S. 833, and *Ronsiek v. Boverschmidts Admr.,* 63 Mo.App. 421. Also, *Macomber v. King,* 288 Mass. 381, 192 N.E. 926.

■ In sum, where, as in this case, an adult or emancipated child, by pre-arrangement with a parent, gives up an established home and moves into the home of the parent, not for the purposes of reestablishing a family relationship, but for the purpose of rendering services of an extraordinary burdensome nature, over a long period of time, the presumption of gratuity need not apply. These facts may constitute ''such exceptional facts and circumstances as will establish an intention on the one part to charge and on the other to pay, notwithstanding the relation of kinship.'' (quoted from *Gorrell*).

The Court of Appeals envisioned this to be the rule, but it did not specify the facts and circumstances giving rise to the application of this rule in its particularization of ''exceptional'' circumstances, nor was authority cited.

■ In conclusion let us point out that we are in no way departing from the general rule that services rendered to a parent by a child are presumed to be gratuitous, we are simply holding that facts and circumstances such as are present in this case tend to show the services were rendered as the result of an agreement, not family relationship, from which it could reasonably and lawfully follow that consideration is involved.

The other assignments are the same as those dealt with by the Court of Appeals, with whose action thereon we concur.

The judgment of the Court of Appeals, affirming the judgment of the Circuit Court of Wilson County, is affirmed.

## Opinion on Petition to Rehear

A petition to rehear has been filed based on the contention that neither the Court of Appeals nor this Court considered and ruled on the Executor's third assignment of error.

The Executor is mistaken in this contention. The third assignment of error makes the point that the trial judge erred in refusing to direct a verdict on motion of the Executor, which motion was in this language: "If Your Honor please, at this time the defendants to this lawsuit, that is Executor of this estate, moves the court to return a verdict of not guilty."

This motion raised the question whether there was any material evidence on which a jury verdict could be predicated. Both the Court of Appeals and this Court responded to this question. The Court of Appeals in its opinion considered, together, the first and third assignments of error, and expressed the opinion that the two assignments made the single question whether there was sufficient evidence to support the verdict against a motion for a directed verdict. In the course of considering that question the Court of Appeals thoroughly and extensively reviewed the pertinent facts, and overruled the assignment of error. This Court, being satisfied that the Court of Appeals had ruled correctly, concurred in the Court of Appeals action.

■ Neither the Court of Appeals nor this Court responded to the argument that the trial judge's action in overruling the motion for a new trial was reversible error because the trial judge stated that his reason for so doing was that the case was being tried by a jury and that if he were trying the case as a non-jury case he would sustain the motion for a directed verdict. This argument, was not considered because it did not merit attention. However, since this proposition is again insisted upon by the petitioner to rehear, we respond by pointing out to the Executor that it is a fundamental rule of law that an appellate court will not reverse a correct judgment of a trial court which is based upon an insufficient or wrong reason therefor. Some twenty-five or more cases wherein this rule has been applied are collected in 2 Tennessee Digest, Appeal & Error, 854(2).

It follows that the petition to rehear should be, and hereby is, denied.