In re ESTATE OF William C. MARKS.

Court of Appeals of Tennessee,
at Nashville.

Jan. 6, 2004 Session.

Sept. 6, 2005.

Permission to Appeal Denied by
Supreme Court Feb. 21, 2006.

Joseph F. Welborn, III and Kathryn Hays Sasser, Nashville, Tennessee; and G. Frank Lannom, Lebanon, Tennessee, for the appellant, David Marks, Executor of the Estate of William C. Marks.

William E. Farmer and James H. Kinnard, Lebanon, Tennessee, for the appellee, Ada Midgett.

## OPINION

WILLIAM C. KOCH, JR., P.J., M.S., delivered the opinion of the court, in which WILLIAM B. CAIN and PATRICIA J. COTTRELL, JJ., joined.

This appeal involves a monetary claim filed against an estate by the decedent's fiancée. After the decedent died before completing the arrangements for his fiancée's financial security, the fiancée filed a claim against his estate in the Wilson County Probate Court seeking to recover lost wages, the reasonable value of the services she rendered to the decedent, and the income she expected to earn as a trustee of a trust established by the decedent. A jury returned a general verdict awarding the fiancée $475,000 and the possession of an automobile. The trial court thereafter denied the estate's post-trial motions, including its motion for a judgment in accordance with its motion for a directed verdict and for a new trial, and the estate appealed. We have concluded that the trial court erred by submitting the lost wages and lost trustee income claims to the jury and that the evidence does not support a verdict of $475,000 on the claim for the reasonable value of the fiancée's services. Accordingly, we vacate the judgment and remand the case for a new trial solely on the fiancée's claim for the reasonable value of the compensable services she rendered to the decedent.

## I.

William C. Marks was a successful businessman in Wilson County. His business interests included Mark Enterprises, H & M Enterprises, Tennessee Private Storage, Marks Rentals, Wilson County Rock Products, and LoJac Enterprises. In addition, he owned and managed a number of residential and commercial properties. Mr. Marks was also a substantial shareholder of Commerce Union Bank in Lebanon where he had maintained most of his banking relationships since the 1950s.

Commerce Union Bank was where Mr. Marks first became acquainted with Ada Midgett. Ms. Midgett was a bookkeeper and a teller and also served as the secretary to the bank's president. Assisting Mr. Marks with his banking transactions was among her responsibilities. After Commerce Union Bank was sold to First Tennessee Bank in 1987, Ms. Midgett was named vice president. She continued to work with Mr. Marks's accounts and became thoroughly familiar with his business dealings.

Mr. Marks's wife died in 1991. Three years later, in 1994, Ms. Midgett's husband died. Shortly after the death of Ms. Midgett's husband, Mr. Marks invited Ms. Midgett on a date. The parties were dating regularly by September 1994 when Mr. Marks decided that his physical condition was impairing his ability to manage his many businesses. Accordingly, he requested Ms. Midgett to take a more active role in assisting with his financial affairs. In addition to working with Mr. Marks during banking hours, Ms. Midgett began to help him on her own time.

Mr. Marks and Ms. Midgett became engaged in 1995. By this time, Ms. Midgett had complete access to all of Mr. Marks's business and financial matters. Ms. Midgett began to devote even more time to Mr. Marks's financial affairs. Finally, in

May 1996, Ms. Midgett retired from First Tennessee Bank to devote all her time and energies to Mr. Marks's business and personal matters.

By this time, Mr. Marks's health had deteriorated, and he learned that he had prostate cancer. He began to make arrangements for his and Ms. Midgett's future. Part of these arrangements included creating a trust to benefit his son, David Marks, other family members, and several charitable organizations. This trust had three trustees, including David Marks and Ms. Midgett. Mr. Marks also requested an attorney to draft a pre-nuptial agreement and to prepare a new will that made financial arrangements for Ms. Midgett. When Mr. Marks was no longer able to live alone, Ms. Midgett moved into his house to help provide his daily care. They set a wedding date in June 1997; however, Mr. Marks passed away on May 19, 1997. He had not yet executed the pre-nuptial agreement or his new will.

David Marks was appointed the executor of his father's estate. At first, he asked Ms. Midgett to assist him because of her familiarity with his father's business and financial dealings. However, following a dispute over Mr. Marks's personal property, David Marks no longer consulted Ms. Midgett and exercised his prerogative under his father's trust to remove Ms. Midgett as trustee.

On November 18, 1997, Ms. Midgett filed a claim against Mr. Marks's estate in the Wilson County Probate Court. She sought to recover (1) the salary and benefits she would have earned had she not retired from First Tennessee Bank, (2) payment for the services she provided to Mr. Marks, and (3) the compensation she would have earned had she continued as trustee of Mr. Marks's trust. Following a trial in April 2002, the probate court submitted all three damage claims to the jury,

and the jury returned a general verdict awarding Ms. Midgett $475,000, as well as a 1994 Cadillac that had belonged to Mr. Marks.

Mr. Marks's estate filed a Tenn. R. Civ. P. 50.02 motion seeking a judgment in accordance with its motion for a directed verdict. The estate also moved for a new trial or, in the alternative, for a remittitur. After the probate court denied all of its post-trial motions, the estate perfected this appeal. We have determined that the trial court erred by failing to grant the estate's Tenn. R. Civ. P. 50.02 motion with regard to the portions of Ms. Midgett's claims seeking recovery of her First Tennessee Bank salary and benefits and the wages she would have earned as a trustee of Mr. Mark's trust. We have also determined that the record does not contain material evidence to support awarding Ms. Midgett $475,000 for the services she rendered to Mr. Marks between May 1996 and May 1997.

## II.

### The Estate's Tenn. R. Civ. P. 50.01 and 50.02 Motions

The estate argues on appeal that the probate court erred by denying its motion for directed verdict on all of Ms. Midgett's damage claims and also by denying its post-trial motion for a judgment in accordance with its motion for directed verdict. It asserts that these claims should not have been presented to the jury. We agree with the estate in part. The estate was entitled to a directed verdict with regard to Ms. Midgett's claims for her lost First Tennessee Bank compensation and for her expected income as a trustee.

### A.

### The Standard of Review

Directed verdicts under either Tenn. R. Civ. P. 50.01 or 50.02 are appro-

priate only when reasonable minds cannot differ as to the conclusions to be drawn from the evidence. *Alexander v. Armentrout*, 24 S.W.3d 267, 271 (Tenn.2000); *Eaton v. McLain*, 891 S.W.2d 587, 590 (Tenn. 1994); *Ingram v. Earthman*, 993 S.W.2d 611, 627 (Tenn.Ct.App.1998). A case should not be taken away from the jury, even when the facts are undisputed, if reasonable persons could draw different conclusions from the facts. *Gulf, M. & O.R. Co. v. Underwood*, 182 Tenn. 467, 474, 187 S.W.2d 777, 779 (1945); *Hurley v. Tenn. Farmers Mut. Ins. Co.*, 922 S.W.2d 887, 891 (Tenn.Ct.App.1995). A trial court may, however, direct a verdict with regard to an issue that can properly be decided as a question of law because deciding purely legal questions is the court's responsibility, not the jury's.

In appeals from a directed verdict, the reviewing courts do not weigh the evidence, *Conatser v. Clarksville Coca–Cola Bottling Co.*, 920 S.W.2d 646, 647 (Tenn. 1995); *Benton v. Snyder*, 825 S.W.2d 409, 413 (Tenn.1992), or evaluate the credibility of the witnesses. *Benson v. Tenn. Valley Elec. Coop.*, 868 S.W.2d 630, 638–39 (Tenn. Ct.App.1993). Instead, they review the evidence in the light most favorable to the motion's opponent, give the motion's opponent the benefit of all reasonable inferences, and disregard all evidence contrary to that party's position. *Alexander v. Armentrout*, 24 S.W.3d at 271; *Eaton v. McLain*, 891 S.W.2d at 590; *Smith v. Bridgestone/Firestone, Inc.*, 2 S.W.3d 197, 199 (Tenn.Ct.App.1999). The courts use the same standards when they review a decision either to grant or deny a post-trial motion for a judgment in accordance with a motion for directed verdict. *Holmes v. Wilson*, 551 S.W.2d 682, 685 (Tenn.1977); *Kaley v. Union Planters Nat'l Bank*, 775 S.W.2d 607, 611 (Tenn.Ct.App.1988); *Gro-*

*over v. Torkell*, 645 S.W.2d 403, 409 (Tenn. Ct.App.1982).

### B.

### Ms. Midgett's Claim for Lost First Tennessee Bank Compensation

Ms. Midgett's claim for compensation for lost salary and benefits stems from her retirement from First Tennessee Bank in May 1996. She testified that even though she planned to work for the bank for four additional years, she retired because Mr. Marks requested her assistance with his personal and business finances. She also testified that she understood that she "would be taken care of ... for twenty years."[1] An economist testifying on Ms. Midgett's behalf testified that she would have received $437,625 in salary and benefits had she remained with First Tennessee Bank for four more years.

The estate argues that even if Ms. Midgett believed that Mr. Marks would take care of her if she retired, she failed to present admissible evidence that Mr. Marks agreed to pay her a salary commensurate to what she would have made had she remained at the bank or that he agreed to match the benefits she received from the bank during the time that she performed services for him. In addition, Ms. Midgett failed to present any admissible evidence of a specific agreement to reimburse her for the four years of salary and benefits she would have earned at the bank.

 The record lacks evidence to support Ms. Midgett's claim for lost salary and benefits. While Ms. Midgett desired to base this claim on promises allegedly made to her by Mr. Marks, Tenn.Code Ann. § 24–1–203 (2000), Tennessee's version of the Dead Man's Statute, prevented

---

**1.** Ms. Midgett explained that the twenty-year period was the duration of Mr. Marks's trust.

her from testifying about her agreement with Mr. Marks.[2] Without a contract to evidence such a promise or testimony from third persons that Mr. Marks made these promises, Ms. Midgett has no contract claim against Mr. Marks's estate that would entitle her to receive lost compensation and benefits from First Tennessee Bank. Accordingly, the trial court should have granted the estate's motion for directed verdict with regard to Ms. Midgett's claims for lost First Tennessee Bank salary and benefits.

Ms. Midgett's claim for her lost salary and benefits suffers from one other significant flaw. As this claim was submitted to the jury, it overlapped substantially with Ms. Midgett's quantum meruit claim. The probate court did not place temporal limitations on the periods for which Ms. Midgett was seeking damages. Accordingly, based on the court's instructions, Ms. Midgett could have received a double recovery including her lost salary and benefits and the reasonable value of her services rendered during the same period of time.

### C.

### Ms. Midgett's Claim for Trustee Compensation

■ Ms. Midgett also claimed that she was entitled to recover the salary that she would have earned as one of the trustees of Mr. Marks's trust. She bases this claim on her assertion that Mr. Marks promised her that she would remain a trustee for as long as the trust existed. This claim has two fatal flaws. First, Ms. Midgett's testi-

mony regarding Mr. Marks's promise violated the Dead Man's Statute. Second, even if her testimony regarding Mr. Marks's promise were admissible, it is contrary to the written terms of the trust document.

■ Trust instruments are interpreted similarly to contracts, deeds, or wills. *Marks v. Southern Trust Co.*, 203 Tenn. 200, 205, 310 S.W.2d 435, 437–38 (1958). Determining the settlor's intent is important and may be easily done by looking to the four corners of the trust instrument. *Marks v. Southern Trust Co.*, 203 Tenn. at 205, 310 S.W.2d at 438. Unless the trust instrument is ambiguous or allegations of fraud, accident or mistake have been made, parol evidence or evidence of surrounding facts and circumstances that contradicts or varies the terms of a written instrument may not be considered. *HMF Trust v. Bankers Trust Co.*, 827 S.W.2d 296, 299 (Tenn.Ct.App.1991); *Brown v. Brown*, 45 Tenn.App. 78, 95, 320 S.W.2d 721, 728 (1959).

■ We are not persuaded by Ms. Midgett's argument that Mr. Marks promised her a definite term as a trustee. Obviously, a settlor may appoint as trustee whomever he or she desires. *Estate of Doyle v. Hunt*, 60 S.W.3d 838, 847 (Tenn. Ct.App.2001). However, once a trust instrument has been put into writing, the terms of the instrument govern what occurs and how it will occur. Regardless of whether Mr. Marks and Ms. Midgett had an agreement for him to make her trustee

---

**2.** The purpose of the Dead Man's Statute is to protect estates from spurious claims. *Morfin v. Estate of Martinez*, 831 N.E.2d 791, 798 (Ind.Ct.App.2005). It is based on the common-law principle that an interested party will be powerfully tempted to misrepresent transactions or communications with a deceased person who cannot rebut the party's testimony. *Schimpf v. Gerald, Inc.*, 52 F.Supp.2d 976, 987 (E.D.Wis.1999). Accordingly, the Dead Man's Statute prevents interested parties from giving self-serving testimony regarding conversations or transactions with the deceased when the testimony involves transactions or statements that would either increase or decrease the deceased's estate. *Cantrell v. Estate of Cantrell*, 19 S.W.3d 842, 846 (Tenn.Ct.App.1999).

for the remainder of her life, the trust instrument did not reflect that agreement.

The trust instrument clearly and unequivocally empowered David Marks to terminate a trustee at any time and for any reason without paying a termination fee. Accordingly, whatever understanding Ms. Midgett may have had with Mr. Marks regarding her tenure as a trustee, her legal rights to continue as trustee were limited by the terms of the trust agreement. She, like any other trustee, was subject to being terminated without compensation. Accordingly, the probate court should have granted the estate's directed verdict on Ms. Midgett's claim for lost trustee wages. Therefore, the trial court erred when it instructed the jury that Ms. Midgett could recover the salary she would have earned had she not been terminated as a trustee of Mr. Marks's trust.

Ms. Midgett has already been compensated for any work that she performed as a trustee and is entitled to no further compensation relating to the trust. Therefore, the trial court erred by allowing the jury to consider any evidence of the trust arrangement and by instructing the jury that lost income as trustee may be awarded as damages.

### D.

### Ms. Midgett's Quantum Meruit Claim

■ The estate also argues that the trial court erred by failing to grant a directed verdict regarding Ms. Midgett's quantum meruit claim. It asserts that Ms. Midgett failed to overcome the presumption that her services to Mr. Marks were gratuitous and that she failed to prove that, under the circumstances, Mr. Marks should have understood that she expected compensation for her services. We have determined that the estate was not entitled to a judgment as a matter of law on Ms.

Midgett's quantum meruit claim and, therefore, that the probate court did not err by denying the estate's motion for directed verdict or its motion for a judgment in accordance with its motion for directed verdict.

■ Persons who provide valuable services to another without an agreement regarding compensation are entitled to recover the reasonable value of their services (1) when the circumstances indicate that the parties to the transaction should have understood that the person providing the services expected to be compensated and (2) when it would be unjust to permit the recipient of the services to benefit from them without payment. *Doe v. HCA Health Servs. of Tenn., Inc.*, 46 S.W.3d 191, 197–98 (Tenn.2001); *Castelli v. Lien*, 910 S.W.2d 420, 427 (Tenn.Ct.App.1995). While this principle applies to claims against decedents' estates, its operation is modified by the so-called "family service rule." The family service rule provides that family members are generally precluded from receiving compensation for their services to other family members because the law presumes that these services were gratuitous, motivated more by love and affection than by expectation of compensation. *Key v. Harris*, 116 Tenn. 161, 171, 92 S.W. 235, 237 (1905); *Gorrell v. Taylor*, 107 Tenn. 568, 570, 64 S.W. 888, 888 (1901); *In re Conservatorship of Groves*, 109 S.W.3d 317, 356 (Tenn.Ct.App. 2003); *Cobble v. McCamey*, 790 S.W.2d 279, 281–82 (Tenn.Ct.App.1989).

■ The presumption raised by the family service rule is rebuttable. Persons seeking compensation for services rendered to deceased family members may recover if they prove either that the deceased family member expressly agreed to pay for the services or that the deceased family member knew or should have known that the family member providing

the services expected compensation or reimbursement. *Gorrell v. Taylor*, 107 Tenn. at 570, 64 S.W. at 888; *Estate of Cleveland v. Gorden*, 837 S.W.2d 68, 71 (Tenn.Ct. App.1992). Persons seeking compensation for their services must also establish either the amount of the expenditures made on the decedent's behalf or the reasonable value of the services rendered. *In re Conservatorship of Groves*, 109 S.W.3d at 356.

 Whether a family relationship existed between the decedent and the person providing the services is a question of fact. *McMurry v. Magnusson*, 849 S.W.2d 619, 622 (Mo.Ct.App.1993). In this context, the term "family" draws its meaning from the concept of mutual dependence and "reciprocal kindness" that promotes the comfort and convenience of persons living together as a family. *See Key v. Harris*, 116 Tenn. at 171, 92 S.W. at 237; *Estate of Cleveland v. Gorden*, 837 S.W.2d at 71. Thus, "family" is necessarily a flexible term that is broad enough to include a collective body of persons who form one household and who have reciprocal, natural, or moral obligations to support and care for one another. *See Nat'l Ins. Ass'n v. Simpson*, 155 S.W.3d 134, 139 (Tenn.Ct. App.2004) (holding membership in a family includes the "common types of close relationships, varying greatly in detail, where persons live together as a family in a closely knit group, usually because of close relationship by blood, marriage, or adoption, and deal with each other intimately, informally, and not at arm's length"); *see also In re Estate of Keeven*, 126 Idaho 290, 882 P.2d 457, 464 (1994); *Cole v. Cole*, 517 N.E.2d 1248, 1250 (Ind.Ct.App.1988); *McMurry v. Magnusson*, 849 S.W.2d at

622; *Morrow v. Morrow*, 612 P.2d 730, 733 (Okla.Ct.App.1980). Thus, while a family relationship may be based on a biological or legal relationship, it does not necessarily require ties of consanguinity [3] or affinity.[4] *In re Estate of Milborn*, 122 Ill. App.3d 688, 78 Ill.Dec. 241, 461 N.E.2d 1075, 1079 (1984); *McMurry v. Magnusson*, 849 S.W.2d at 622; *Morrow v. Morrow*, 612 P.2d at 733.

 The types of services covered by the family service rule include the personal, domestic, and household services that family members customarily render to each other without expectation of payment. *See, e.g., Key v. Harris*, 116 Tenn. at 166, 92 S.W. at 236 (waiting on a sister because she was "as helpless as a baby"); *Gorrell v. Taylor*, 107 Tenn. at 569, 64 S.W. at 888 (describing the services provided as the "delicate, personal, and comforting services which are essential to the welfare of a sick person"); *In re Conservatorship of Groves*, 109 S.W.3d at 324 (caring for a physically and mentally infirm relative in the caregiver's home); *Cobble v. McCamey*, 790 S.W.2d at 280 (services included cooking meals and looking after personal needs). Courts of other states have declined to extend the family service rule to services of a business nature that are not normally performed without compensation. *Reece v. Reece*, 239 Md. 649, 660–61, 212 A.2d 468 (1965); *Tracy v. Tracy*, 7 Neb. App. 143, 581 N.W.2d 96, 103 (1998); *Kitchen v. Frusher*, No. 2–04–205–CV, 2005 WL 1542672, at *7 (Tex.App. June 30, 2005).

 For the purpose of applying the family service rule, we find that persons in

---

**3.** Consanguinity refers to a relationship by blood. Bryan A. Garner, *Dictionary of Modern Legal Usage* 35 (2d ed. 1995) (*"Dictionary of Modern Legal Usage"*); *see also State v. Dodd*, 871 S.W.2d 496, 497 (Tenn.Crim. App.1993).

**4.** Affinity refers to relationship by marriage. *Dictionary of Modern Legal Usage* 35; *see also State v. Dodd*, 871 S.W.2d at 497.

contemplation of marriage who are acting like family members are family members.[5] Therefore, the personal services that these persons render to each other are presumed to be gratuitous. If these persons desire to recover the value of their services from their deceased family member's estate, they must present evidence, consistent with the Dead Man's Statute and the hearsay rule, either that the decedent expressly agreed to pay for the services or that the deceased knew or should have known that the person providing the services expected compensation or payment.

█ We have determined that Mr. Marks's estate was not entitled to a judgment on Ms. Midgett's quantum meruit claim. The record contains no competent evidence of an express agreement between Mr. Marks and Ms. Midgett to compensate her for her services.[6] Ms. Midgett provided valuable services that benefited Mr. Marks. Many of these services were more business than personal. In addition, Ms. Midgett testified without contradiction that she understood that Mr. Marks would reward her for the services she rendered after she retired from First Tennessee Bank. Thus, even though Ms. Midgett was a "family member" for the purpose of the family service rule, she presented evidence from which a fact-finder could conclude

that she was entitled to compensation for the reasonable value of the services she provided to Mr. Marks between May 1996 when she retired from the bank and May 1997 when Mr. Marks died.

### III.

**THE VERDICT FOR THE REASONABLE VALUE OF THE SERVICES RENDERED**

As a final matter, Mr. Marks's estate argues that the evidence does not support the amount of damages awarded by the jury. Specifically, the estate asserts that if Ms. Midgett is entitled to recover anything, she may recover only the reasonable value of the services she rendered to Mr. Marks. We agree. The record does not contain material evidence to support the jury's $475,000 damage award.

### A.

█ Reviewing courts must, whenever possible, give effect to a jury's verdict. *Bankhead v. Hall*, 34 Tenn.App. 412, 424, 238 S.W.2d 522, 527 (1950). Thus, we must give verdicts their most favorable interpretation and must give effect to the jury's intent if permissible under the law. *Briscoe v. Allison*, 200 Tenn. 115, 125–26, 290 S.W.2d 864, 868 (1956); *Newsom v.*

---

5. This court has implicitly recognized that the family service rule applies to persons who are living together even when they are not married. In at least three cases, the person who provided the services claimed that the decedent expressly contracted to compensate them by promising to "take care of" them. These claimants were pursuing an express contract claim to rebut the presumption that their services had been gratuitous. *Schulze v. Vires (In re Estate of Vires)*, No. W2000–02953–COA–R3–CV, 2002 WL 1760502, at *4 (Tenn. Ct.App. Apr.10, 2002), *perm. app. denied* (Tenn. Oct. 7, 2002) (noting that the parties were living together for their mutual benefit); *Estate of Nease v. Sane*, No. 03A01–9104–CH–00150, 1991 WL 220594, at *2 (Tenn.Ct.App.

Nov.1, 1991), *perm. app. denied* (Tenn. Mar. 9, 1992) (noting that the parties had lived together for fifteen years ostensibly as husband and wife for their own mutual benefit); *McGinnis v. Estate of Carpenter*, Hawkins Chanc. 30, 1985 Tenn.App. LEXIS 3009, at *1 (Tenn.Ct.App. July 16, 1985) (No Tenn. R.App. P. 11 application filed) (the claimant and the decedent had seriously discussed marriage but postponed the wedding for financial reasons).

6. As we have already pointed out, a decedent's promise to "take care of" someone does not give rise to an express or implied contract.

*Markus,* 588 S.W.2d 883, 886 (Tenn.Ct. App.1979).

A jury's verdict consists of separate findings of liability and assessment of damages. *All v. John Gerber Co.,* 36 Tenn.App. 134, 138, 252 S.W.2d 138, 139 (1952), *modified by Camper v. Minor,* 915 S.W.2d 437 (Tenn.1996); *Bd. of Mayor & Aldermen of Covington v. Moore,* 33 Tenn. App. 561, 568, 232 S.W.2d 410, 413 (1950). Both portions of the verdict must be consistent with the law and the evidence, and thus, all the jury's factual findings must be supported by material evidence. *See* Tenn. R.App. P. 13(d). In cases in which a plaintiff has asserted multiple claims for relief, the validity of a jury's general verdict for the plaintiff will not be undermined because of the lack of material evidence to support one or more claims as long as the record contains material evidence supporting at least one of the claims. *Tutton v. Patterson,* 714 S.W.2d 268, 271 (Tenn.1986); *Anderson v. Mason,* 141 S.W.3d 634, 640 (Tenn.Ct.App.2003).

### B.

The measure of damages for a quantum meruit claim is the actual value of the services provided. *Mitch Grissim & Assocs. v. Blue Cross Blue Shield of Tenn.,* 114 S.W.3d 531, 537 (Tenn.Ct.App. 2002); *Lawler v. Zapletal,* 679 S.W.2d 950, 955 (Tenn.Ct.App.1984). Persons seeking a quantum meruit recovery must present some proof regarding the reasonable value of the services rendered. *See CPB Management, Inc. v. Everly,* 939 S.W.2d 78, 81 (Tenn.Ct.App.1996); *Bokor v. Holder,* 722 S.W.2d 676, 680–81 (Tenn.Ct.App.1986). The evidence of the value of the services provided need not be exact. An estimation of the value of the services will suffice, *Adams v. Underwood,* 225 Tenn. 428, 438, 470 S.W.2d 180, 184 (1971), as long as it is sufficiently precise to enable the fact-find-

er to avoid a highly speculative assessment of damages. *Peters v. Michael Constr. Co.,* 688 S.W.2d 81, 85 (Tenn.Ct.App.1984).

The reasonable value of services should be based on the customs and practices prevailing in the same sort of business in which the services would normally be provided. *Chisholm v. Western Reserves Oil Co.,* 655 F.2d 94, 96 (6th Cir.1981). The proof can be provided by the plaintiff him or herself, and it may be provided from other professionals in the same trade or business. *Castelli v. Lien,* 910 S.W.2d at 428 (upholding the trial court's consideration of the testimony of other interior designers regarding the reasonable value of an interior designer's services). In circumstances where it is customary to charge hourly fees, a quantum meruit claim should include evidence regarding: (1) the nature of the services provided, (2) the period during which the services were provided, (3) the number of hours worked, and (4) the hourly rate customarily charged for these services.

Ms. Midgett testified that she did not expect to be compensated for her services until after she retired from First Tennessee Bank. Accordingly, the only period for which she could be compensated for her services is from May 1996 until Mr. Marks's death in May 1997. She also testified that she had been compensated at the rate of $19.50 per hour when she worked for the bank. There is some ambiguity in the record regarding the number of hours Ms. Midgett worked on Mr. Marks's affairs, and there is no clear delineation regarding the time Ms. Midgett spent providing personal services to Mr. Marks or providing assistance with his business affairs. While the parties stipulated that Ms. Midgett spent 413.5 hours performing services for Mr. Marks in the presence of third persons, Ms. Midgett

testified that she spent 9,000 hours providing services to Mr. Marks.

The jury's $475,000 verdict cannot be sustained by the evidence Ms. Midgett presented regarding the services she performed, the number of hours she worked, and the fee per hour for the services she performed. It is unlikely that Ms. Midgett spent 9,000 hours performing services for Mr. Marks between May 1996 and May 1997.[7] In addition, the evidence does not clearly delineate between the number of hours Ms. Midgett spent providing personal services to Mr. Marks and the number of hours she spent working on his businesses. Were we to assume that Ms. Midgett spent 2,100 hours between May 1996 and May 1997 rendering compensable services to Mr. Midgett, the reasonable value of these services, based on Ms. Midgett's testimony regarding the value of the services, would be $41,000.[8] Even if we gave Ms. Midgett credit for the full 9,000 hours she claimed, the value of these services could not exceed $175,500.[9]

The amount of the jury's verdict leads to only one conclusion—that it was not just based on Ms. Midgett's evidence regarding the reasonable value of her services between May 1996 and May 1997. The jury obviously took into consideration the evidence Ms. Midgett presented regarding the value of the salary and benefits she lost when she retired from First Tennessee Bank and the earnings she would have received had she remained a trustee of Mr. Marks's trust for twenty years. The record does not contain material evidence to support a $475,000 award to Ms. Midgett for the reasonable value of her services between May 1996 and May 1997. Accordingly, we must vacate the judgment awarding Ms. Midgett $475,000 and remand the case for a new trial on Ms. Midgett's quantum meruit claim for the services she provided to Mr. Marks between May 1996 and May 1997.

## IV.

We vacate the judgment with the exception of the award of the automobile to Ms. Midgett, and remand the case to the probate court for a new trial consistent with this opinion and for any other proceedings that may be required. We tax the costs of this appeal in equal proportions to the Estate of William C. Marks and its surety and to Ada Midgett for which execution, if necessary, may issue.

---

7. Assuming that Ms. Midgett worked a full forty-hour week, performing 9,000 hours of services would take approximately four years and four months. If Ms. Midgett performed forty hours of services per week for Mr. Marks between her retirement from the bank and Mr. Marks's death, she would have rendered approximately 2,100 hours of services.

8. 2,100 hours × $19.50/hour = $40,950.

