IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
January 11, 2024 Session

## MICHAEL VITELLARO v. DONNA GOODALL

**Appeal from the Circuit Court for Wilson County**
**No. 20-CV-654      Michael Collins, Judge**

_____

### No. M2023-00246-COA-R3-CV
_____

The Plaintiff suffered significant injuries after falling through a plastic, debris-covered skylight embedded in the roof of the Defendant's shop building. The Plaintiff sued the Defendant homeowner, alleging that the debris-covered skylight constituted a dangerous condition and that the Defendant failed to warn of its existence prior to the accident. After the Plaintiff did not call the Defendant as a witness and rested his case in chief, the Defendant sought a directed verdict, arguing that the Plaintiff could not establish that the Defendant had actual or constructive notice of the condition. The trial court agreed and granted the Defendant's motion. Viewing the proof in the light most favorable to the Plaintiff, as required at this stage of the proceeding, we conclude that the trial court erred in granting a directed verdict. We remand for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed;**
**Case Remanded**

JEFFREY USMAN, J., delivered the opinion of the Court, in which ANDY D. BENNETT and W. NEAL MCBRAYER, JJ., joined.

Justin L. Crouch and Giovanni Rosania, Nashville, Tennessee, for the appellant, Michael Vitellaro.

Cory R. Miller and Parks T. Chastain, Nashville, Tennessee, for the appellee, Donna Goodall.

### OPINION

#### I.

This appeal concerns a premises liability lawsuit over injuries sustained by Michael Vitellaro on Donna Goodall's Wilson County property. Ms. Goodall, who lives in Mount Juliet, Tennessee, has a detached garage building near her home that the parties refer to as

a "shop building." The shop building is a metal structure with a green roof and is flanked on multiple sides by trees, poison ivy vines, and a variety of other vegetation.

The shop building roof is slanted, but not sharply so, and rises to a peak in the middle. The roof of the shop building has embedded near its peak multiple plastic skylights on the front and back sides of the roof. Mark Buchanan, an expert engineer who was deposed by the parties but who did not testify at trial, explained that these skylights were installed in 2005 and were designed to only bear about twenty pounds of weight, which comported with the then-existing International Building Code. Ms. Goodall admitted in her answer that she was aware that these skylights were embedded in the shop building roof.

In late May 2020, debris from the surrounding trees as well as moss, vines, and plants growing on the roof and its gutters resulted in at least ninety percent of the shop building's roof being covered. At the time of the accident, Mr. Vitellaro owned and operated a company called Mid Tenn Pressure Washing that specialized in pressure washing, surface cleaning, and gutter cleaning at commercial and residential properties. Acting on a friend's recommendation, Ms. Goodall sought Mr. Vitellaro's services. Ms. Goodall described the status of the shop building at the time in a message she sent to her friend:

> I added hubby's detached garage [to the estimate]. There's 2 small trees growing in the gutter. Won't budge but [Mr. Vitellaro] has a way to get them out. Then there's poison [ivy] all over my old carport that my hubby's flatbed trailers are under. [Mr. Vitellaro's] got a killer to get [that] off.

Mr. Vitellaro met Ms. Goodall at her home on May 26, 2020, to examine the shop building, and he testified about the encounter at trial:

> [Mr. Vitellaro:] She met me outside, and we walked the property, and she showed me, you know, what she wanted done as far as the work.
>
> [Counsel:] And what all did she ask you to do? I believe you said clean out the front gutters of the shop.
>
> [Mr. Vitellaro:] Yes.
>
> [Counsel:] And was any of that cleaning the debris from on top of the shop roof?
>
> [Mr. Vitellaro:] Yeah, she wanted the gutters cleaned on the front side only of the shop. She didn't want the back side cleaned. She wanted all debris

moved from the top, and there were poison ivy over the shop, kind of taking the shop over, and she wanted that removed as well.

. . .

[Counsel:]  All right.  And any pressure-washing discussed?

[Mr. Vitellaro:]  You know, just pressure-wash the gutters after we cleaned all the debris out of them.

[Counsel:]  The shop?

[Mr. Vitellaro:]  Both.

[Counsel:]  All right. The shop and the house?

[Mr. Vitellaro:]  Yeah, she wanted them rinsed off and cleaned.

Mr. Vitellaro and Ms. Goodall agreed that he would complete the above-described work for $350.

Mr. Vitellaro has consistently maintained and testified at trial that Ms. Goodall never informed him that the shop building roof had embedded skylights.  Although the parties did not initially discuss the possibility of Mr. Vitellaro getting on top of the roof, he testified that Ms. Goodall did not instruct him to avoid doing so during the preliminary meeting.  Due to the presence of the aforementioned debris on top of the shop building, Mr. Vitellaro could not see any of the skylights.

Two days later, Mr. Vitellaro arrived at Ms. Goodall's property at approximately 9:00 a.m. to begin his work.  Only about ten percent of the metal roof was visible, as debris from nearby trees as well as moss, vines, and various plants obscured the remaining ninety percent. Mr. Vitellaro testified that this was apparent even to individuals like Ms. Goodall who would be looking at the roof from the ground.  Mr. Vitellaro never went inside the shop building; instead, he immediately set up his own ladder "against the face" of the shop building before climbing up towards the roof.  According to Mr. Vitellaro, Ms. Goodall watched him climb the ladder and attempt to remove the trees from the gutters without actually getting on top of the roof.  However, he explained, "The trees themselves, the roots had grown all the way down the gutter lines from end to end, and as I was pulling to just try and remove the tree, it was pulling the gutter and moving it.  And I didn't want to pull the gutter off the face of the building."

When Mr. Vitellaro determined the tree would not budge unless he got on top of the roof, he told Ms. Goodall, "there's no way these trees are going to come out.  I need to get

on top of the roof, clip the roots, and pull it out." Ms. Goodall agreed that would be appropriate. She did not caution Mr. Vitellaro against getting on the roof or inform Mr. Vitellaro that the roof had embedded plastic skylights. Instead, Ms. Goodall instructed Mr. Vitellaro to scoop up the remaining debris scattered across the front of the roof and dispose of it by "throw[ing] [it] into the cow field behind the shop." Mr. Vitellaro testified that he asked, "So I can just walk and throw them back there?" and that she responded, "Yes . . . Don't worry about getting any debris or anything on the back side, because that wasn't part of the estimate." According to Mr. Vitellaro, Ms. Goodall specifically indicated that it would be fine to walk across the roof and throw the debris into the cow field behind the shop.

Following this conversation, Ms. Goodall went inside her house, and Mr. Vitellaro mounted the roof. Mr. Vitellaro isolated the roots of the first tree, cut them, took the tree in his hand, and then "proceeded to go up towards the top of the shop to come to the back side to throw it into the cow field." With his first step onto the back side of the roof, however, Mr. Vitellaro "immediately fell through" one of the skylights located at "the peak" of the roof, landing approximately twenty feet below and inside the shop building. Photographs taken two years after the incident and entered into evidence at trial depict a blue tarp covering the hole created in the roof when the plastic skylight gave way, and that blue tarp covers parts of both the front and back side of the roof.[1] When Ms. Goodall returned outside about ten minutes later, she saw Mr. Vitellaro injured on the ground and called emergency medical services. Mr. Vitellaro suffered serious injuries as a result of his fall, including but not limited to a broken pelvis, lacerations on his elbow and on the back of his head, multiple back fractures, and significant chest bruising.

Mr. Vitellaro brought a premises liability action against Ms. Goodall in Wilson County Circuit Court on December 10, 2020. He alleged that Ms. Goodall "knew" or "should have known the shop building structure was not sound structurally," that Ms. Goodall "had a duty to maintain the shop building structure in a safe condition," and that Ms. Goodall "failed to warn . . . that the shop building structure was unsafe." After completing some discovery, Mr. Vitellaro amended his complaint on November 9, 2022, to specifically allege that Ms. Goodall "knew the plastic skylights were present," that Ms. Goodall "knew and/or should have known the plastic skylights would not support a person's weight," that Ms. Goodall "knew and/or should have known the plastic skylights were not visible," that Ms. Goodall "knew and/or should have known that the plastic skylights presented a dangerous, defective, and/or unsafe condition," and that Ms. Goodall "failed to warn [him] about the plastic skylights." Though Ms. Goodall denied most of Mr. Vitellaro's allegations in her answer to Mr. Vitellaro's amended complaint, she

_____

[1] Mr. Vitellaro maintains that many of the photographs entered into evidence do not accurately depict the amount of debris on the roof of the shop building on May 28, 2020. However, Mr. Vitellaro agreed that the tarp, which stretched from the front side across the peak to the back side, accurately identifies the area where he fell through the roof.

- 4 -

"admit[ted] she knew there were light transmitting plastic panels on the roof of the shop building prior to [Mr. Vitellaro's] fall."

The parties began trying Mr. Vitellaro's case on January 19, 2023. In advance of the hearing, Ms. Goodall submitted a witness list that included herself and Mr. Buchanan, the expert who inspected Ms. Goodall's home after the accident, as potential defense witnesses. At trial, Mr. Vitellaro did not call either Ms. Goodall or Mr. Buchanan in his case in chief, nor did Mr. Vitellaro enter into evidence any of the technical information that Mr. Buchanan provided about the mechanics of Ms. Goodall's skylights. Instead, Mr. Vitellaro testified as to the facts of the accident, and two of his family members as well as a medical expert testified about the nature and extent of his injuries. Mr. Vitellaro recounted all of the facts referenced above, including his pre-work meeting with Ms. Goodall, the events of May 28, 2020, and the aftermath of his fall. Numerous exhibits were also entered into evidence, including many pictures of the shop building, the messages sent between Ms. Goodall and a friend of Ms. Goodall's before and after the accident, and a copy of Mr. Vitellaro's amended complaint.

Ms. Goodall's counsel cross-examined Mr. Vitellaro. While Ms. Goodall's counsel sought to emphasize the visibility of the skylights in the pictures entered into evidence, Mr. Vitellaro noted that many of the photographs were taken years after the incident during discovery and do not accurately reflect the amount and nature of the debris covering the shop building roof on May 28, 2020; he indicated that the debris covered at least ninety percent of the roof. In response to questioning from Ms. Goodall's counsel, Mr. Vitellaro maintained that he never once noticed any of the skylights prior to his fall, noting that, if he had seen them, he would have avoided stepping on them.

Once Mr. Vitellaro rested his case in chief, Ms. Goodall moved for a directed verdict. Ms. Goodall argued that Mr. Vitellaro, by virtue of not having called Ms. Goodall as a witness, presented no proof that she was aware of the existence of the debris-covered skylights. Based on this characterization of Mr. Vitellaro's proof, Ms. Goodall argued that he could not establish either actual or constructive notice, an essential element of his premises liability action. Mr. Vitellaro argued that he presented sufficient evidence to defeat her motion. "The whole point of this," Mr. Vitellaro's counsel argued, "is that she – the testimony has been that she hired him to clear the roof and the debris that it had accumulated over a period of time since her husband passed, three years. The natural accumulation of debris is a condition that she should have known about. She knew that the skylights were there and she knew that there was accumulation of debris on the roof." Based on these observations, Mr. Vitellaro concluded that, "[Ms. Goodall's] the one that had superior knowledge of what was on that roof and the conditions that came and went through the accumulation, the natural accumulation over time, that it was unkempt for three years' time. The known or should have known standard is satisfied entirely."

The trial court disagreed and granted Ms. Goodall's motion. The trial court reasoned that

> The proof was that the dangerous condition is not the leaves. It's not the skylight. It is the leaves covering the skylight that created the dangerous condition. . . . I looked at Plaintiff's Exhibit V. That was some messages between Ms. Goodall and [a friend of Ms. Goodall's]. Looks like it described where she was reaching out to him to describe the terrible condition of the gutters, trees growing in them, wanting to pressure wash the gutters. There was some talk about some other stuff, pressure washing other stuff, but it was about gutters.
>
> . . .
>
> Well, I'm looking at all this in the light most favorable to Mr. Vitellaro. So the condition of leaves covering the skylight is the dangerous condition. Did [Ms. Goodall] know that? Well, I can't find anywhere there's testimony of actual notice.
>
> . . . .
>
> I'm going to find that the dangerous condition was not the leaves. It was not the skylight. It was the leaves on the back side of the shed completely covering the skylight. And there's no testimony that the defendant, Ms. Goodall, knew of it or should have known about it.
>
> She knew there was some – the testimony is she knew there was something – let's just say she knew there were some leaves on the roof. There's no testimony that she knew the leaves were completely covering the skylight, and even when I take the proof . . . the strongest legitimate view of the proof . . . I was stretching, trying to get to that point, trying to make it happen. And when I felt myself in the exercise of trying to stretch and make it happen, I just can't do that.

Mr. Vitellaro appeals, challenging the trial court's decision to grant Ms. Goodall's motion for directed verdict. We restate the issues presented for review by Mr. Vitellaro in his brief as follows: (1) whether the trial court erred in granting Ms. Goodall's motion for directed verdict, and (2) whether the trial court should have reserved ruling on Ms. Goodall's motion for directed verdict until the end of her case-in-chief.

## II.

Under Tennessee Rule of Civil Procedure 50.01,

A motion for a directed verdict may be made at the close of the evidence offered by an opposing party or at the close of the case. The court shall reserve ruling until all parties alleging fault against any other party have presented their respective proof-in-chief. A party who moves for a directed verdict at the close of the evidence offered by an opponent may offer evidence in the event that the motion is not granted, without having reserved the right so to do and to the same extent as if the motion had not been made. A motion for a directed verdict which is not granted is not a waiver of trial by jury even though all parties to the action have moved for directed verdicts. The order of the court granting a motion for a directed verdict is effective without any assent of the jury.

"A case should not be taken away from the jury, even when the facts are undisputed, if reasonable persons could draw different conclusions from the facts." *In re Estate of Marks*, 187 S.W.3d 21, 27 (Tenn. Ct. App. 2005) (citing *Gulf, M. & O.R. Co. v. Underwood*, 187 S.W.2d 777, 779 (Tenn. 1945)). Accordingly, motions for directed verdict should only be granted when "reasonable minds could reach only one conclusion from the evidence." *Johnson v. Tenn. Farmers Mut. Ins. Co.*, 205 S.W.3d 365, 370 (Tenn. 2006); *see Benton v. Snyder*, 825 S.W.2d 409, 413 (Tenn. 1992).

"When considering a trial court's ruling on a motion for a directed verdict, we review the ruling *de novo* and apply the same standards used by the trial court." *101 Constr. Co. v. Hammet*, 603 S.W.3d 786, 794 (Tenn. Ct. App. 2019) (citing *Brown v. Crown Equip. Co.*, 181 S.W.3d 268, 281 (Tenn. 2005)). Those standards are different depending on whether the trial court enters a directed verdict on a legal issue versus a factual issue. Trial courts, as is true in other contexts, are empowered to make determinations on purely legal issues without the assistance of a jury. *In re Estate of Marks*, 187 S.W.3d at 27-29 (explaining that jury involvement is not required "with regard to an issue that can properly be decided as a question of law because deciding purely legal questions is the court's responsibility, not the jury's"). We review purely legal conclusions, including its overall decision to grant a directed verdict, de novo on appeal, affording the trial court no presumption of correctness. *Iloube v. Cain*, 397 S.W.3d 597, 601 (Tenn. Ct. App. 2012); *see also Brown v. Christian Bros. Univ.*, 428 S.W.3d 38, 49 (Tenn. Ct. App. 2013) ("A motion for directed verdict provides a vehicle for deciding questions of law . . . .").

The standard for judging a trial court's factual determinations at the directed verdict stage is different. When reviewing the factual predicate underpinning a grant of a directed verdict, we take the strongest legitimate view of the evidence "by construing it in the light most favorable to the non-movant and discarding all countervailing evidence." *Eaton v. McLain*, 891 S.W.2d 587, 590 (Tenn. 1994); *Gaston v. Tenn. Farmers Mut. Ins. Co.*, 120 S.W.3d 815, 819 (Tenn. 2003). "A directed verdict cannot be based upon speculation,

- 7 -

conjecture, guesswork, or a mere spark or glimmer of evidence." *Brown*, 428 S.W.3d at 49. "[I]f material evidence is in dispute or doubt exists as to the conclusions to be drawn from that evidence, the motion must be denied." *Johnson*, 205 S.W.3d at 370 (citing *Hurley v. Tenn. Farmers Mut. Ins. Co.*, 922 S.W.2d 887, 891 (Tenn. Ct. App. 1995)). Evidence is material if it "must necessarily enter into the consideration of the controversy and by itself, or in connection with the other evidence, be determinative of the case." *Day v. Beaver Hollow L.P*, 612 S.W.3d 32, 37 (Tenn. Ct. App. 2020) (quoting *Meals ex rel. Meals v. Ford Motor Co.*, 417 S.W.3d 414, 422 (Tenn. 2013)). "Only if there is no material evidence in the record that would support a verdict for the plaintiff under any of the plaintiff's theories, may the trial court's action in directing a verdict be sustained." *Brown*, 428 S.W.3d at 50 (citing *Jamestowne on Signal, Inc. v. First Fed. Sav. & Loan Ass'n*, 807 S.W.2d 559 (Tenn. Ct. App. 1990)).

III.

The trial court's order granting Ms. Goodall's motion for a directed verdict is grounded upon two conclusions. First, the trial court concluded that the dangerous condition at the heart of Mr. Vitellaro's case was "the leaves on the back side of the shed completely covering the skylight." Second, related to that conclusion, the trial court found that Mr. Vitellaro presented no proof that Ms. Goodall had either actual or constructive notice of that dangerous condition. In other words, Mr. Vitellaro did not prove that Ms. Goodall "knew of . . . or should have known" of the existence of "the leaves on the back side of the shed completely covering the skylight."

The trial court reached these conclusions in the context of considering a premises liability claim, which is "a species of negligence under which a duty may arise from nonfeasance rather than misfeasance." *Fulghum v. Notestine*, No. M2022-00420-COA-R3-CV, 2023 WL 7151647, at *6 & n.8 (Tenn. Ct. App. Oct. 31, 2023) (collecting cases); *Energen Res. Corp. v. Wallace*, 642 S.W.3d 502, 512 (Tex. 2022). The Tennessee Supreme Court has explained that

> persons seeking to prevail against a property owner on a premises liability claim must prove the elements of a negligence claim, *and in addition*, must prove either that "the condition was caused or created by the owner, operator, or his agent," or "if the condition was created by someone other than the owner, operator, or his agent, that the owner or operator had actual or constructive notice that the condition existed prior to the accident."

*Parker v. Holiday Hospitality Franchising, Inc.*, 446 S.W.3d 341, 350 (Tenn. 2014) (footnote omitted) (quoting *Blair v. W. Town Mall*, 130 S.W.3d 761, 764 (Tenn. 2004)). The alluded-to elements of a negligence claim are "(1) a duty of care owed by the defendant to the plaintiff; (2) conduct by the defendant falling below the standard of care amounting to a breach of that duty; (3) an injury or loss; (4) causation in fact; and (5) proximate or

legal cause." *Satterfield v. Breeding Insulation Co.*, 266 S.W.3d 347, 355 (Tenn. 2008). Ms. Goodall based her motion for a directed verdict on the first of these elements, duty, as well as the additional premises liability requirements, *i.e.*, either the creation of a dangerous condition or the existence of actual or constructive notice. *See id.*; *Parker*, 446 S.W.3d at 350.

Premises owners like Ms. Goodall owe a duty to invitees, like Mr. Vitellaro, to exercise "reasonable care under all the circumstances." *See Eaton*, 891 S.W.2d at 593. This liability "stems from [the premises owner's] superior knowledge of the condition of the premises." *Blair*, 130 S.W.3d at 764 (quoting *McCormick v. Waters*, 594 S.W.2d 385, 387 (Tenn. 1980)). A premises owner must guard their invitee "against any latent dangerous condition on the premises" that the owner was "aware or should have been aware [of] through the exercise of reasonable diligence" by either "removing or warning" their invitee of the dangerous condition. *Eaton*, 891 S.W.2d at 594; see also *Blair*, 130 S.W.3d at 766. Moreover, even if a dangerous condition is "open and obvious" to the plaintiff before their accident, liability still flows from a failure to warn if the condition posed a foreseeable risk of harm that "was unreasonable despite its open and obvious nature." *Coln v. City of Savannah*, 966 S.W.2d 34, 43-44 (Tenn. 1998), *overruled on other grounds by Cross v. City of Memphis*, 20 S.W.3d 642, 643 (Tenn. 2000).

The trial court stated that it believed the dangerous condition present on Ms. Goodall's property was "not the leaves. It's not the skylight. It is the leaves covering the skylight that created the dangerous condition." However, the very fact that the skylights were covered by debris means that the dangerous condition was "latent" or "hidden," creating a need for a warning. *See Eaton*, 891 S.W.2d at 594.

The trial court's conclusion that Ms. Goodall lacked actual or constructive knowledge of leaves covering the skylights on the back side of the shop is inconsistent with the evidence when viewed in the light most favorable to Mr. Vitellaro. The fall occurred when Mr. Vitellaro took a single step passing over the peak of the roof onto the back side of the shop. The exhibits reflect that the slant of the roof is not steep and that the surrounding trees are more densely concentrated near the back rather than the front of the shop. Debris from the trees was covering the roof. Mr. Vitellaro testified that at least ninety percent of the roof was covered. It is unclear on what basis the back of the roof would be expected to be less covered than the front, especially given the relative proximity of the back side of the shop to the surrounding trees. To the contrary, it would appear that one would reasonably expect that the roof on the back side of the shop building would be more densely covered with debris than the front side of the shop building. Additionally, the conversations between Ms. Goodall and Mr. Vitellaro reflect Ms. Goodall was aware that there was debris on the back side of the roof. Furthermore, Mr. Vitellaro testified as follows regarding knowledge of the skylights being covered:

[Counsel:]  Would she have known that the roof was covered in debris to the point the skylights weren't visible?

[Mr. Vitellaro:]  Yes, you could see it from the ground.

[Counsel:]  You could see the debris from the ground?

[Mr. Vitellaro:]  Yes.

In other words, Mr. Vitellaro testified that the debris covering the skylights, which had been building up over an extended period, was visible from the ground.  This testimony is not limited to an assertion that the front side of the shop building is visible but not the back, and from the exhibits it is unclear why only the front would be visible from the ground.

Ms. Goodall conceded in her pleadings that she "knew that the skylights were there."  The trial court's ruling arose from its determination that there was no evidence that Ms. Goodall knew or should have known "the leaves were completely covering the skylight" on the back side of the shop building.  We cannot agree.  Mr. Vitellaro presented adequate proof on that point to create a jury question as to Ms. Goodall's actual or constructive knowledge.  Not only did Mr. Vitellaro state that ninety percent of the roof was covered by debris, but he testified that the entirety of the skylights were covered and that said coverage was evident to anyone, including Ms. Goodall, who would be looking up at the roof from the ground.  This debris built up over an extended period of time.  There is no reason to think that the debris coverage on the roof towards the back of the shop building would be less than on the front.  To the contrary, the proximity of the trees is such that the back of shop building would appear to be more susceptible to debris coverage than the front.  In other words, one could reasonably conclude that Ms. Goodall knew or should have known that the skylights on the back side of the shop were covered.  *See Johnson*, 205 S.W.3d at 370; *In re Estate of Marks*, 187 S.W.3d at 27.  A reasonable jury may well find that Ms. Goodall "actually knew" or, at the very least, should have known about the dangerous condition that ultimately caused Mr. Vitellaro's injuries.  *See Martin v. Washmaster Auto Ctr., U.S.A.*, 946 S.W.2d 314, 319 (Tenn. Ct. App. 1996).  Consequently, the trial court erred in granting Ms. Goodall's motion for directed verdict, and that order should be reversed.[2]

## IV.

For the aforementioned reasons, we reverse the judgment of the Circuit Court for Wilson County.  Costs of this appeal are taxed to the appellee, Donna Goodall, for which

---

[2] Having concluded that the trial court erred in granting Ms. Goodall's motion for a directed verdict, we pretermit Mr. Vitellaro's argument that the trial court should have waited until the end of all proof to rule upon the motion.

execution may issue if necessary. The case is remanded for such further proceedings as may be necessary and consistent with this opinion.

_____
JEFFREY USMAN, JUDGE