IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
September 19, 2023 Session

## ESTATE OF ELLA MAE HAIRE ET AL. V. SHELBY J. WEBSTER ET AL.

**Appeal from the Chancery Court for Knox County**
**No. 191583-2     Richard B. Armstrong, Jr., Chancellor**

_____

**No. E2022-01657-COA-R3-CV**

_____

Decedent's son, individually and as personal representative of his mother's estate, sued several of his siblings and decedent mother's bank. Among other things, the son alleged that the bank breached its duties to the decedent by disbursing funds out of her checking and savings accounts following her death. Eventually, the bank moved for summary judgment, arguing that it was not negligent in its handling of the decedent's accounts, nor did it breach any contractual duty to either the decedent or her son. The son appeals and, discerning no error by the trial court, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Affirmed; Case remanded**

KRISTI M. DAVIS, J., delivered the opinion of the Court, in which FRANK G. CLEMENT JR., P.J., M.S., and JOHN W. MCCLARTY, J., joined.

Robin M. McNabb, Knoxville, Tennessee, for the appellant, Phillip Daniel Haire, Individually and as Personal Representative of the Estate of Ella Mae Haire, Deceased.

J. Michael Winchester and E. Brian Sellers, Knoxville, Tennessee, for the appellee, First Horizon Bank.

## OPINION

### BACKGROUND

This appeal stems from a lawsuit between siblings and First Horizon Bank[1] ("the Bank"), arising from payable-upon-death ("POD") bank accounts originally belonging to Ella Mae Haire ("Decedent") and her late husband. Phillip Daniel Haire ("Mr. Haire" or "Danny Haire"), Shelby Webster, and Paul David Haire are siblings and three of

_____

[1] The Bank was formerly known as First Tennessee Bank.

Decedent's five children.  This is the parties' second time before this Court, the previous appeal having proceeded all the way to our Supreme Court.   Our High Court's opinion contains helpful background:

> [Decedent] and Paul Haire ("Father") were married and had five children. They held title as joint tenants with right of survivorship to real property in Knoxville, Tennessee, and to bank accounts, including a savings account and a checking account at First Tennessee Bank, N.A. ("Bank"). In the early 2000s, [Decedent] and Father grew too aged to manage their own affairs. Thus, their eldest son, Mr. Haire, the plaintiff in this case, assisted his parents with managing their finances. On August 1, 2005, [Decedent] executed a durable power of attorney naming Mr. Haire as her attorney-in-fact for financial matters. Father died on April 1, 2008, and [Decedent] became the sole owner of all the property she and Father had owned as joint tenants with right of survivorship, including the checking and savings accounts at issue in this appeal.
>
> [Decedent] was ninety-one years old when Father died and "incapable of managing her finances." On April 18, 2008, about three weeks after Father's death, [Decedent] and Mr. Haire completed a new signature card for the checking account at the Bank. A year later, on October 30, 2009, [Decedent] and Mr. Haire completed a new signature card for the savings account at the Bank. In the sections of the signature cards titled "Style of Account," [Decedent's] and Mr. Haire's names were listed. On both signature cards, an "X" had been placed in boxes next to preprinted text reading, "Joint tenants with right of survivorship." [Decedent's] and Mr. Haire's cursive signatures appeared on lines at the bottom of the signature cards beneath the preprinted instruction "SIGN HERE (exactly as Account is to read and as checks or withdrawals are to be signed)."
>
> From 2008 to 2012, Mr. Haire served as [Decedent's] primary caretaker, and during this time, [Decedent's] health continued to decline. She no longer drove and rarely left her home. Mr. Haire hired a home health care service to visit her and attend to her personal needs, paying for the expenses related to her care with funds from certificates of deposit he and [Decedent] also held jointly at the Bank.
>
> Near the beginning of 2012, due to disagreements with his younger sister, Shelby Webster, Mr. Haire "relinquished management of [Decedent's] affairs" to Mrs. Webster and to his brother, Paul David Haire ("Mr. David Haire"). Mrs. Webster "lived in New Mexico and visited [Decedent] a few

- 2 -

times a year for one to two weeks at a time." Mr. David Haire and his wife lived in Knoxville.

According to the allegations of Mr. Haire's complaint, "from early 2012 until her death on November 15, 2013," [Decedent] was "incompetent to manage her own affairs and did not possess the legal capacity to execute deeds, contracts, and other legal documents." When Mr. Haire surrendered [Decedent's] care to his siblings, he did not discuss with anyone the savings and checking accounts he and [Decedent] held at the Bank as joint tenants with right of survivorship, nor at any time did he sign paperwork or take any action to remove his name as a joint tenant of those accounts.

Nevertheless, a new set of signature cards was completed on June 7, 2012, for the savings and checking accounts and later processed by the Bank. [Decedent's] name appeared in the section titled "Style of Account." A box next to the preprinted text "Joint tenants with right of survivorship" was blank, but an "X" had been marked in a box next to a blank line, and the abbreviations "POD SOL" appeared on that line. [Decedent's] cursive signature and Mrs. Webster's and Mr. Haire's names appeared on lines at the bottom of the signature cards beneath the preprinted instruction "SIGN HERE (exactly as Account is to read and as checks or withdrawals are to be signed)." Next to the names of Mrs. Webster and Mr. Haire, the abbreviation "PUD" appeared.

The Bank later processed another set of signature cards that was completed on October 5, 2012. The names of [Decedent], Mrs. Webster, Mr. David Haire, and Mr. Haire appeared in the section titled "Style of Account." The abbreviations "POA POD" appeared next to the names of Mrs. Webster, Mr. David Haire, and Mr. Haire. The box next to the preprinted phrase "Joint tenants with right of survivorship" was again blank, but an "X" appeared in the box next to the preprinted phrase "Additional authorized signer (Power of Attorney)." An "X" also appeared in the box next to the blank line, and on that line the abbreviations "POD SOL" had been typed. The cursive signatures of [Decedent], Mrs. Webster, and Mr. David Haire and the printed name of Mr. Haire appeared below the instruction "SIGN HERE (exactly as Account is to read and as checks or withdrawals are to be signed)." Next to the names of Mrs. Webster, Mr. David Haire, and Mr. Haire were the abbreviations "POA/POD." On October 8, 2012, three days after the foregoing signature cards were completed, [Decedent] executed a durable power of attorney naming Mr. David Haire as her attorney-in-fact and naming Mrs. Webster as his successor, should he be unable to serve as attorney-in-fact.

Yet another set of signature cards was completed on November 16, 2012, and subsequently processed by the Bank. This time, the savings account signature card listed the names of [Decedent] and Mrs. Webster in the "Style of Account" section. The box next to the preprinted text "Joint tenants with right of survivorship" had been left blank, but an "X" appeared in the box next to the blank line, and "SOL owner POD" had been written on that line. Beneath the instruction "SIGN HERE (exactly as Account is to read and as checks or withdrawals are to be signed)" were [Decedent's] and Mrs. Webster's cursive signatures and Mrs. Webster's handwritten printed name. Next to Mrs. Webster's cursive signature was the abbreviation "POA," and next to her handwritten printed name was the abbreviation "POD."

The checking account signature card completed November 16, 2012, listed the names of [Decedent] and Mr. David Haire in the "Style of Account" section. Next to Mr. David Haire's name were the handwritten abbreviations "POA/POD." The box next to the preprinted text "Joint Tenants with right of survivorship" was again blank, but an "X" appeared in the box next to the blank line, and on that line the abbreviations "SOL POD" appeared. Beneath the instruction "SIGN HERE (exactly as Account is to read and as checks or withdrawals are to be signed)" were [Decedent's] and Mr. David Haire's cursive signatures and Mr. David Haire's handwritten printed name. Next to Mr. David Haire's cursive signature was the abbreviation "POA," and next to his handwritten printed name was the abbreviation "POD."

About a year later, on October 17, 2013, the final signature card for the checking account was completed and later processed by the Bank. The names of [Decedent], Mrs. Webster, and Mr. David Haire appeared in the section titled "Style of Account." Next to Mr. David Haire's and Mrs. Webster's names were the abbreviations "POA POD." The box next to the preprinted text "Joint tenants with right of survivorship" was still blank. An "X" appeared in the box next to the preprinted text "Additional authorized signer (Power of Attorney)" and in the box next to the preprinted blank line. On the blank line the abbreviations "POD SOL" were typed. Beneath the instruction "SIGN HERE (exactly as Account is to read and as checks or withdrawals are to be signed)" were [Decedent's], Mrs. Webster's, and Mr. David Haire's cursive signatures. Next to Mrs. Webster's and Mr. David Haire's signatures were the abbreviations "POA POD." [Decedent] died on November 15, 2013, less than a month after this final signature card was completed.

After [Decedent's] death, Mr. Haire was appointed personal representative of her estate. Mr. Haire then learned, for the first time, that he was not listed as a joint tenant with right of survivorship on the savings and checking

accounts at the Bank at the time of [Decedent's] death. He also learned that the Bank had paid the funds remaining in the savings account, approximately $129,000.00, to Mrs. Webster and had paid the balance of the checking account, approximately $11,500.00, to Mr. David Haire and Mrs. Webster.

*Est. of Haire v. Webster*, 570 S.W.3d 683, 685–87 (Tenn. 2019) (footnotes omitted). Mr. Haire filed his lawsuit in the Chancery Court for Knox County ("trial court") on May 9, 2016, naming Mrs. Webster, Paul David Haire, and various other individuals as defendants.[2] Mr. Haire also sued the Bank as both the personal representative of Decedent's estate and in his individual capacity, "claim[ing] that, by removing him from the savings and checking accounts, the Bank had breached its contract with him and [Decedent] and had engaged in actions that constituted conversion. Mr. Haire attached to his complaint copies of all of the previously described signature cards." *Id.* at 687–88 (footnote omitted).

The Bank filed a motion to dismiss for failure to state a claim for which relief could be granted, which the trial court granted following a hearing. Mr. Haire appealed but this Court affirmed. *See Est. of Haire v. Webster*, No. E2017-00066-COA-R3-CV, 2017 WL 5899860 (Tenn. Ct. App. Nov. 29, 2017). Our Supreme Court concluded, however, that Mr. Haire's "complaint [was] sufficient to survive the Bank's motion to dismiss for failure to state a claim." 570 S.W.3d at 696.

Our Supreme Court remanded the case back to the trial court for further proceedings. By agreement of the parties, Mr. Haire filed an amended complaint, alleging claims against the Bank for breach of contract, breach of bailment contract, and negligence. Mr. Haire also asked that the account signature cards signed during and after 2012 be declared void due to Decedent's incapacity and/or undue influence, and that a constructive trust be imposed on the account funds. To the extent a constructive trust was not possible because the funds had been disbursed, Mr. Haire requested money damages.

Lengthy trial delays ensued due to the COVID-19 pandemic. Eventually, the Bank filed a motion for summary judgment, the subject of the present appeal, on August 12, 2022. The trial court modified the trial date and set the motion for summary judgment for hearing on November 7, 2022. In support of its motion, the Bank filed, among other things, the affidavit of Tina L. Jones ("Jones affidavit") and the affidavit of Tracy L. Pressley ("Pressley affidavit"). Ms. Jones is the Vice President of the Bank, and her affidavit provided, as relevant, that she previously worked as a branch manager and in that capacity had personal interactions with Decedent as well as Mrs. Webster and Mr. Paul David Haire. Ms. Jones recalled assisting Decedent, in person, with the execution of the signature cards

---

[2] This appeal pertains only to Mr. Haire's claims against the Bank, and no other parties are participating.

with which Mr. Haire takes issue.  The Jones affidavit also provides that to the best of Ms. Jones' memory, Decedent appeared to understand the nature and consequences of the disputed signature cards.  The Pressley affidavit explains that Ms. Pressley is Vice President and Retail Market Support Specialist/East Market for the Bank.  Ms. Pressley stated that she had been employed by the Bank for many years and was familiar with the depositor agreements controlling the accounts at issue.

The Bank argued in its motion that Mr. Haire's claims to declare the signature cards void, impose a constructive trust on the accounts, and obtain money damages, were unsupported by the depositor agreements and applicable law.  According to the Bank, Decedent's alleged incompetence or undue influence by the siblings was insufficient to establish liability against the Bank.  The Bank also argued estoppel and laches, noting that the accounts at issue were closed and the funds distributed to the beneficiaries years before the present litigation.  Along with the affidavits and other materials, the Bank filed with its motion five depositor agreements.  The Bank claimed the agreements establish rules and contractual terms controlling its accounts from 2007 through 2014.  Relying on the depositor agreements, the Bank asserted that Mr. Haire could not establish a breach of contract, as the terms of the depositor agreements allow changes in account ownership:

> The relevant Depositor Agreements in effect at all material times contain specific provisions and terms appointing each person that is a joint owner or account holder signing a signature card **as attorney in fact for each other person signing the signature card "for all matters involving the account**, rendering each of you personally liable for the others account activity, **including but not limited to** receiving and giving notice,... **appointing or removing additional signers**, and withdrawing funds from charging or terminating the account."

On October 31, 2022, Mr. Haire filed a motion to strike portions of the Bank's rule 56.03 statement of undisputed material facts.  Mr. Haire argued that several of the Bank's purported facts were not supported by admissible evidence and were not concise statements containing only one fact.  Because the Jones and Pressley affidavits contain statements about interactions with Decedent, Mr. Haire also argued that certain statements in the affidavits were inadmissible under the Dead Man's statute.  *See* Tenn. Code Ann. § 24-1-203.

The trial court held a hearing on November 7, 2022, after which it took the motion to strike and the motion for summary judgment under advisement.  It then entered an order on November 28, 2022, denying Mr. Haire's motion to strike and granting the Bank's

motion for summary judgment as to all of Mr. Haire's claims against the Bank.[3]  The trial court certified the order as final, and Mr. Haire filed a timely notice of appeal to this Court.

**ISSUES**

Mr. Haire raises the following issues on appeal:

1. Whether the trial court erred in denying Mr. Haire's motion to strike.

2. Whether the trial court erred in granting the Bank's motion for summary judgment.

**DISCUSSION**

*A. Motion to strike*

Mr. Haire argues first that the trial court erred in denying his motion to strike, making several sub-arguments in support.  First, Mr. Haire takes issue with the Pressley affidavit and the depositor agreements, claiming that the depositor agreements are inadmissible.  Evidence offered in support of a motion for summary judgment must be admissible, and "evidence that would be substantively inadmissible at trial would likewise be inadmissible at the summary judgment stage." *Lexon Ins. Co. v. Windhaven Shores, Inc.*, 601 S.W.3d 332, 340 (Tenn. Ct. App. 2019) (quoting *Shipley v. Williams*, 350 S.W.3d 527, 564, 565 & n.12 (Tenn. 2011) (Koch, J., concurring in part and dissenting in part)).  "An abuse of discretion standard applies to decisions regarding the admissibility of evidence filed in support of or in opposition to motions for summary judgment." *Id.*

In relevant part, the Pressley affidavit provides that

> the Depositor Agreements attached to the Bank's Answer, Counterclaims, and Crossclaims, as amended, as **Exhibits 1-5, inclusive,** are true and complete copies of the Depositor Agreements relating to the Accounts that establish rules and contractual terms that control such Accounts at the Bank from and after 2007 through and including 2013-14[.]

Ms. Pressley opined in her affidavit that she was familiar with the Bank's depositor agreements and the types of accounts to which those agreements apply, including Decedent's checking and savings accounts.  The Pressley affidavit also provides that the

---

[3] The trial court's final order provides that during the November 7, 2022 hearing, Mr. Haire conceded that the issue of a constructive trust was moot.  Mr. Haire does not challenge that on appeal or address his claim for a constructive trust at all.  Nor does he address the trial court's dismissal of his claim for breach of bailment contract.  Accordingly, we need not address these claims.

signature cards and depositor agreements associated with Decedent's accounts were retained by the Bank in its normal course of business.

According to Mr. Haire, the depositor agreements should be "disregarded" because "Ms. Pressley cannot tie each Depositor Agreement to the time period during which it allegedly governed the accounts forming the basis of [Mr. Haire's] claims against the Bank." Mr. Haire urges that "the applicable dates and duration of a contract are material terms[,]" and without them, "the documents are not relevant to the Bank's defense against [Mr. Haire's] breach of contract claims and should have been stricken." At the November 7, 2022 hearing, Mr. Haire argued that the signature cards, which he admits signing, are contracts standing alone. Thus, he contends the depositor agreements are unnecessary.

The trial court rejected Mr. Haire's objections to the Pressley affidavit and the depositor agreements, concluding in its final order as follows:

> As to the admissibility and authenticity of the evidence proffered on summary judgment by the Bank, the Court finds and concludes that the affidavits submitted by the Bank, which states that the affiants are personally familiar with the Bank's records, properly authenticate the documents to which they reference pursuant to Tenn. R. Evid. 901. The affidavit of Mrs. Pressley further states that the copies of the Depositor Agreements and the Signature Cards as attached to the various pleadings in this case, including the Motion for Summary Judgment, are true and accurate copies of the Bank's records. The Court is also of the opinion that the documents would be admissible at trial as the records are relevant to the matter and qualify for a hearsay exception under Tenn. R. Evid. 803(6).

The trial court did not abuse its discretion. While Mr. Haire makes much of the fact that the Bank has not explained the exact dates upon which each depositor agreement went into effect and terminated, it is not necessarily problematic given the particular circumstances of this case. None of the depositor agreements contain termination dates. Rather, all furnished versions of the Bank's depositor agreement provide that a customer's bank account may be closed and the agreement terminated by the customer at any time, but also that the Bank may revise its depositor agreements at any time.[4] The Bank is also

---

[4] In *Estate of Haire*, our Supreme Court noted that, per the complaint allegations, "Mr. Haire was an owner of the account in a contractual relationship with the Bank," and that "[c]ontracts in Tennessee may not be modified except with the consent of all the parties." 570 S.W.3d at 693 (citing *Galbreath v. Harris*, 811 S.W.2d 88, 92 (Tenn. Ct. App. 1990)). However, in the first appeal our Supreme Court addressed only whether Mr. Haire's allegations were sufficient to withstand a Tennessee Rule of Civil Procedure 12.02(6) challenge. The Supreme Court did not consider the language of the depositor agreements, which provide that the Bank may revise the agreement at any time and that the customer therefore may terminate the relationship at any time.

required, under all versions of the depositor agreement, to maintain a copy of the current agreement for the customer's inspection. Contrary to Mr. Haire's contentions, it is possible under the circumstances for more than one depositor agreement to apply to one bank account, depending upon how many times the Bank revises its blanket depositor agreement while that bank account is open. The Bank provided its revised depositor agreements for the years 2007, 2008, 2009, 2011, and 2013. Ms. Pressley explained in her affidavit that these agreements controlled the accounts at issue during the relevant time period, the clear import being that the previous depositor agreement controls until the Bank issues a revised version.

Mr. Haire signed the checking account signature card on April 18, 2008, and the savings account signature card on October 30, 2009. Both signature cards provide that "signers below acknowledge receipt of the Depositor Agreement with disclosures for the account indicated and agree to be bound by its terms *as well as any changes or additions hereafter adopted by [the Bank]*." (Emphasis added). Accordingly, the Bank's failure to more specifically tie the depositor agreements to particular dates is inapposite. The Bank had the right to revise its agreement with Mr. Haire and Decedent at any point. While the Pressley affidavit could have been more specific, we do not agree with Mr. Haire that the depositor agreements are entirely irrelevant on this basis. Nor can we endorse his argument that the signature cards alone represent the full terms of Mr. Haire's agreement with the Bank; indeed, the plain language of the signature cards quoted above belies that argument. Mr. Haire was bound by each version of the depositor agreement that was in effect during the times he was a joint owner on his mother's accounts.[5]

Moreover, Mr. Haire has not explained in his brief, with sufficient citations to the technical record and legal authority, how the trial court's ruling amounts to an abuse of its broad discretion on evidentiary issues. *See Lexon Ins. Co.*, 601 S.W.3d at 340 ("An abuse of discretion standard applies to decisions regarding the admissibility of evidence filed in support of or in opposition to motions for summary judgment."). Even if we disagreed with the trial court's ruling on this issue, which we do not, we are not permitted under the deferential standard of review to substitute our judgment for that of the trial court. *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 927 (Tenn. 1998). Rather, Mr. Haire would need to show that the trial court applied an incorrect legal standard, reached an illogical conclusion, based its decision on a clearly erroneous assessment of the evidence, or employed reasoning that caused an injustice. *State v. Clark*, 452 S.W.3d 268, 287 (Tenn. 2014) (citing *State v. Banks*, 271 S.W.3d 90, 116 (Tenn. 2008)). He has not done so.

---

[5] As addressed in more detail below, the provisions of the depositor agreements that are dispositive in this appeal are the same in each revised version of the agreement. This buttresses our conclusion that despite the lack of better specificity in the Bank's affidavits, the depositor agreements are not irrelevant.

Next, Mr. Haire claims that the trial court erred in denying his motion to strike because certain portions of the Jones and Pressley affidavits violate Tennessee Code Annotated section 24-1-203, also known as the Dead Man's statute, which provides:

> In actions or proceedings by or against executors, administrators, or guardians, in which judgments may be rendered for or against them, neither party shall be allowed to testify against the other as to any transaction with or statement by the testator, intestate, or ward, unless called to testify thereto by the opposite party. If a corporation is a party, this disqualification shall extend to its officers of every grade and its directors.

The statute's purpose "is to protect estates from spurious claims and prevent interested parties from giving self-serving testimony regarding conversations or transactions with the deceased when the testimony involves transactions or statements that would either increase or decrease the deceased's estate." *Mitchell v. Johnson*, 646 S.W.3d 754, 765 (Tenn. Ct. App. 2021) (citing *In re Est. of Marks*, 187 S.W.3d 21, 28 n.2 (Tenn. Ct. App. 2005)). Section 24-1-203 is "an exception to the presumption of competence that exists under [Tennessee Rule of Evidence 601], which states that '[e]very person is presumed competent to be a witness except as otherwise provided in these rules or by statute.'" *Id.* at 765 n.12. As such, the statute "must be strictly construed against the exclusion of testimony and in favor of its admission." *Id.* (citing *Haynes v. Cumberland Builders, Inc.*, 546 S.W.2d 228, 230–31 (Tenn. Ct. App. 1976)).

Here, Mr. Haire sought exclusion of certain portions of the Pressley and Jones affidavits, particularly portions in which Ms. Jones opines about having seen Decedent execute the later signature cards. The trial court rejected Mr. Haire's argument, finding section 24-1-203 inapplicable because Ms. Pressley and Ms. Jones are not "officers" of the Bank within the meaning of the statute.

While we agree with the trial court's ultimate conclusion that the Dead Man's statute is inapplicable in this case, we reach that conclusion on a different basis. *See Bobo v. City of Jackson*, 511 S.W.3d 14, 26 n.14 (Tenn. Ct. App. 2015) (explaining that this Court may affirm a trial court's entry of summary judgment on grounds different than those found by the trial court, so long as those grounds are supported by the record). Section 24-1-203 bars "interested parties from giving self-serving testimony regarding conversations or transactions with the deceased when the testimony involves transactions or statements that would either increase or decrease the deceased's estate." *Mitchell*, 646 S.W.3d at 765 (citing *Est. of Marks*, 187 S.W.3d at 28 n.2); *see also Holliman v. McGrew*, 343 S.W.3d 68, 73 (Tenn. Ct. App. 2009); *Newark Ins. Co. v. Seyfert*, 392 S.W.2d 336 (Tenn. 1964). In *Newark Ins. Co.*, for example, this Court held that statements by a widow were permissible under the statute because the life insurance proceeds at issue would go directly to the decedent's widow, as opposed to the widow as executrix of the deceased's estate:

Since in this case the recovery would not go to the estate but to statutorily designated beneficiaries, and the judgment would not be for or against Mrs. Seyfert as personal representative, her interest as such being nominal, the estate having no interest whatsoever in the res of the action, the insurance proceeds, we are of opinion the statute does not apply. (See Miller v. First Natl. Bank of Linton, 62 N.D. 122, 242 N.W. 124; 97 C.J.S. Witnesses § 137; Pugh v. Turner, 145 Tex. 292, 197 S.W.2d 822, 172 A.L.R. 707; St. Louis Union Trust Co. v. Hammans, 204 Ark. 298, 161 S.W.2d 950[)].

*Id.* at 345–46; *see also Baker v. Baker*, 142 S.W.2d 737, 744 (Tenn. Ct. App. 1940) ("[W]e think it a reasonable view that the statute does not contemplate a proceeding, the result of which can neither increase nor diminish the assets of the estate but concerns only the manner in which the assets will be distributed.").

In the present case, the relief sought would not increase or decrease the value of Decedent's estate because Mr. Haire, individually, is asking to be restored as the owner of the bank accounts. In the operative complaint, Mr. Haire states that "[t]he changes made by the Fiduciaries through those signature cards from and after June 2012 are void or voidable due to Decedent's lack of capacity or undue influence[,]" and that "[t]he signature cards dated June 7, 2012, are [] void or voidable due to the forged signature of Danny Haire." The Bank points this out in its principal brief, arguing that no *estate* funds are being sought considering Mr. Haire's posture. Mr. Haire disputes this in his reply brief, arguing as follows:

[Mr. Haire] would also point out that there was also a formal request for the Signature Cards from 2012 onward to be voided. Voiding those Signature Cards could result in a few outcomes, one of which would be that the decedent's estate and Danny Haire individually would have each been entitled to half of the Accounts as of June 7, 2012 by finding that the joint tenancy was severed by removing Danny Haire's name from the Accounts. If that were the court's holding, the trial court could conceivably require the Bank to restore those amounts to the respective parties. Doing so would increase the Estate's assets by tens of thousands of dollars.

We are unpersuaded by the foregoing, as voiding the signature cards from 2012 on would simply result in Mr. Haire *individually* acquiring the account funds. Decedent added Mr. Haire to her checking account in 2008 and to her savings account in 2009. Decedent made Mr. Haire a joint tenant with rights of survivorship on both accounts. *See Est. of Haire*, 570 S.W.3d at 685. Under all versions of the Bank's depositor agreement, funds in joint accounts with rights of survivorship belong to the surviving account owner. Per every version of the depositor agreement, this is true "even if the decedent had a will directing disposition to someone else."

- 11 -

Voiding all signature cards from 2012 on, as Mr. Haire has consistently requested from the start of this case, would leave remaining the 2008 and 2009 signature cards on which Mr. Haire is listed as a joint owner with rights of survivorship.[6]  Thus, Mr. Haire would be the sole surviving owner of the accounts.  Pursuant to the depositor agreements, regardless of which version is applicable, the account funds would belong to Mr. Haire individually as opposed to Decedent's estate.  And Mr. Haire has never suggested that the 2008 and 2009 signature cards should be voided or set aside.  *See* Tenn. Code Ann. § 45-2-703(e)(1) ("A designation of joint tenants with right of survivorship, or substantially similar language, shall be conclusive evidence in any action or proceeding of the intentions of all named that title vests in the survivor[.]").  Consequently, Mr. Haire has not sought relief against the Bank that would result in increased assets for Decedent's estate.  *See Holliman*, 343 S.W.3d at 73 ("The [Dead Man's] statute only applies to 'actions . . . by or against executors, administrators, or guardians, in which judgments may be rendered for or against them.'" (quoting Tenn. Code Ann. § 24-1-203)).  On appeal, Mr. Haire argues that because the trial court is a court of equity, there is a world in which some funds from the accounts could go to Decedent's estate.  This argument is speculative at best and is inconsistent with the manner in which Mr. Haire has couched and pursued his claims against the Bank.  Because of the plain language of the depositor agreements, and the nature of joint tenancies with rights of survivorship, we are unconvinced by Mr. Haire's argument.

Construing the statute strictly against exclusion and in favor of admissibility, as we must, *see Mitchell*, 646 S.W.3d at 765 n.12, we conclude that Tennessee Code Annotated section 24-1-203 does not apply to the statements with which Mr. Haire takes issue.  The trial court did not err in denying Mr. Haire's motion to strike on this basis.

Finally, Mr. Haire asserts that the trial court should have granted the motion to strike certain "undisputed material fact[s]" proffered by the Bank because its "Rule 56 Statement contained many numbered paragraphs with multiple 'facts', such that the statements should have been stricken or, at a minimum, the Bank should have been required to separate the paragraphs[.]"  According to Mr. Haire, "this process becomes confusing and, in some cases, potentially misleading for the non-movant."  On this point, the trial court found the statements sufficient, concluding that "the Court does not find that the statements are so unconcise as to require striking.  Although some of the statements may be somewhat long and may incorporate many documents, each statement only accomplishes to set out one fact for consideration."

---

[6] At the November 7, 2022 hearing, counsel for Mr. Haire stated that the relief sought was "to have the signature cards declared void from the first one in which Mr. Haire was removed as a co-owner . . ."  Counsel also stated that "[w]e want [the later signature cards] to be nullified and we want to return the account to its previous status as joint tenants with right of survivorship between [Decedent] and Danny Haire."

We agree with the trial court's ruling and find no abuse of discretion. This is especially true in light of Mr. Haire's failure to include citations to the appellate record and legal authority, aside from Tennessee Rule of Civil Procedure 56.03, in this portion of his appellate brief. *See* Tenn. R. App. P. 27(a)(7).

Based on all of the foregoing, we find no abuse of discretion in and affirm the denial of Mr. Haire's motion to strike.

*B. Motion for summary judgment*

Mr. Haire's second issue presented for review is whether the trial court erred in granting the Bank's motion for summary judgment. A trial court may grant summary judgment only if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04. The propriety of a trial court's summary judgment decision presents a question of law, which we review de novo with no presumption of correctness. *Kershaw v. Levy*, 583 S.W.3d 544, 547 (Tenn. 2019).

"The moving party has the ultimate burden of persuading the court that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law." *Martin v. Norfolk S. Ry. Co.*, 271 S.W.3d 76, 83 (Tenn. 2008). As our Supreme Court has instructed,

> when the moving party does not bear the burden of proof at trial, the moving party may satisfy its burden of production either (1) by affirmatively negating an essential element of the nonmoving party's claim or (2) by demonstrating that the nonmoving party's evidence *at the summary judgment stage* is insufficient to establish the nonmoving party's claim or defense.

*Rye v. Women's Care Ctr. of Memphis*, 477 S.W.3d 235, 264 (Tenn. 2015). "[I]f the moving party bears the burden of proof on the challenged claim at trial, that party must produce at the summary judgment stage evidence that, if uncontroverted at trial, would entitle it to a directed verdict." *TWB Architects, Inc. v. Braxton, LLC*, 578 S.W.3d 879, 888 (Tenn. 2019) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (1986)).

When a party files and properly supports a motion for summary judgment as provided in Rule 56, "to survive summary judgment, the nonmoving party may not rest upon the mere allegations or denials of its pleading, but must respond, and by affidavits or one of the other means provided in Tennessee Rule 56, set forth specific facts . . . showing that there is a genuine issue for trial." *Rye*, 477 S.W.3d at 265 (internal quotation marks and brackets in original omitted). "Whether the nonmoving party is a plaintiff or a

defendant – and whether or not the nonmoving party bears the burden of proof at trial on the challenged claim or defense – at the summary judgment stage, '[t]he nonmoving party must demonstrate the existence of specific facts in the record which could lead a rational trier of fact to find in favor of the nonmoving party.'" *TWB Architects*, 578 S.W.3d at 889 (quoting *Rye*, 477 S.W.3d at 265). "This court will affirm the trial court's summary judgment if it finds that the trial court reached the correct result, 'irrespective of the reasons stated.'" *Wood v. Parker*, 901 S.W.2d 374, 378 (Tenn. Ct. App. 1995) (quoting *Clark v. Metro. Gov't of Nashville and Davidson Cnty.*, 827 S.W.2d 312, 317 (Tenn. Ct. App. 1991)).

As a threshold matter, several sub-arguments under Mr. Haire's second issue lack both record citations as well as citations to legal authority. The Tennessee Rules of Appellate Procedure provide that the argument of an appellant's brief shall contain "the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record (which may be quoted verbatim) relied on[.]" Tenn. R. App. P. 27(a)(7).

> As we have previously held, a "skeletal argument that is really nothing more than an assertion will not properly preserve a claim." *Chiozza v. Chiozza*, 315 S.W.3d 482, 489 (Tenn. Ct. App. 2009) (quoting *Newcomb v. Kohler Co.*, 222 S.W.3d 368, 400 (Tenn. Ct. App. 2006)). Moreover, "the failure to make appropriate references to the record and to cite relevant authority in the argument section of the brief as required by Rule 27(a)(7) constitutes a waiver of the issue." *Bean* [*v. Bean*], 40 S.W.3d [52, 55 (Tenn. Ct. App. 2000)].

*Little v. City of Chattanooga*, 650 S.W.3d 326, 370 (Tenn. Ct. App. 2022).

Mr. Haire's first sub-argument under issue two is that the Bank failed to "state which Depositor Agreement(s) applied at the time that Danny Haire was listed as a joint owner of the Checking and Savings Accounts or how a modification of same could be binding upon owners who did not have notice of the changes." However, this argument contains no citations to the appellate record or supporting legal authority. Consequently, it is skeletal, and we deem it waived. Further, we addressed this argument in the first section of our opinion and explained why it is unpersuasive. Mr. Haire acknowledged receipt of the Bank's depositor agreements by signing signature cards in both 2008 and 2009, thereby agreeing to be bound by any changes to the agreement made by the Bank. Consequently, Mr. Haire was subject to the terms of each revised version of the Bank's depositor agreements until he was removed as an account owner.

Mr. Haire also asserts that the trial court erred in granting summary judgment to the Bank as to Mr. Haire's negligence claim. This argument is also skeletal, as it contains no citations to the appellate record or supporting legal authority. As such, both of these arguments are waived pursuant to Tennessee Rule of Appellate Procedure 27, and we need not consider them. *See Little*, 650 S.W.3d at 370.

The only remaining argument in Mr. Haire's brief is the assertion that the trial court "erred in granting summary judgment to the Bank based on an 'attorney-in-fact' provision in at least one Deposit Agreement." We understand this argument to be addressing the trial court's conclusion that the Bank is entitled to summary judgment on Mr. Haire's breach of contract claim.

To reiterate, Mr. Haire claims that the signature cards themselves represent the contract breached by the Bank. The crux of his claim is that the Bank failed to give Mr. Haire notice before removing him from Decedent's accounts and that Mr. Haire did not consent to being removed as an owner of the accounts. The Bank asserts that there is no provision, in any version of the depositor agreement, that requires the Bank to have given Mr. Haire notice before Decedent removed him from her accounts.

The trial court agreed with the Bank, finding that

> The Bank's Rule 56 Statements shows that the Depositor Agreements that have been included in the Bank's summary judgment materials are the Depositor Agreements, inclusively, that were effective after 2007 through and including 2013 and 2014, which is the entire period of time material to the claims against the Bank. The April 2008 Signature Card, which is also included in the Bank's summary judgment materials, states that "Signers below acknowledge receipt of the Depositor Agreement with disclosures for the Account indicated and agree to be bound by its terms as well as any changes or additions hereafter adopted by bank." This Signature Card is signed by the Decedent and by Plaintiff Danny Haire. By signing this Signature Card, Plaintiff Danny Haire acknowledge [sic] receipt of the Depositor Agreement and agreed to be bound by its terms as well as any changes or additions. The Court finds and concludes that the Signature Card expressly incorporates the terms of the Depositor Agreement and reflects the Plaintiffs' assent to be bound by those terms and any changes or additions thereto.

> The Bank's Rule 56 Statement, however, does not state which Depositor Agreement was in effect when Plaintiff Danny Haire signed the April 2008 Signature Card. That being said, the provisions of the Depositor Agreements on which the Bank relies are essentially identical throughout the

five documents the Bank proffers on summary judgment. Upon reviewing the applicable provisions of the five documents, the Court finds and concludes that the provisions on which the Bank relies are uniform or, at the very least, substantively similar between the documents as to not affect this Court's construction of the provisions. The Court finds and concludes that the Bank has shown that the Plaintiffs were not only bound by the 2008 Signature Card, but also by at least one of the five Depositor Agreement, all of which having the same effective provisions for the purposes of this Motion for Summary Judgment.

The trial court then reasoned that a "Liability" provision in the 2008 depositor agreement absolved the Bank:

The Depositor Agreement, by which Plaintiff Danny Haire agreed to be bound when he signed the April 2008 Signature Card, appoints each joint owner of an account as an attorney-in-fact for the other joint owners under the provision titled LIABILITY. Under this provision, Plaintiff Danny Haire appointed the Decedent as his attorney-in-fact "for all matters involving the account, ..., including, but not limited to, receiving and giving notice, ..., pledging or entering separate agreements affecting the account, ..., appoint or removing additional signers, and withdrawing funds from, charging or terminating the account." That provisions also "render[s] each of [the joint owners] personally liable for the other's account activity." The Court finds and concludes that the plain language of that provision allows Decedent to modify the contract to remove Plaintiff Danny Haire's name as joint owner of the account. The Court further finds and concludes that the Decedent consented on behalf of Plaintiff Danny Haire as his attorney-in-fact to remove his name from the account as joint owner.

The LIABILITY provision also acts as a limitation of liability clause that limits the Bank's liability to "actual damages proved that are proximately caused by [the Bank's] failure to exercise ordinary care." The Court further finds and concludes that the Bank's processing of a new Signature Card at the direction of the Decedent to remove Plaintiff Danny Haire's name from the account is not a failure to exercise ordinary care when Plaintiff Danny Haire appointed the Decedent as his attorney-in-fact for such an action. The LIABILITY provision renders a joint account owner personally liable to the other joint account owners for his or her account activity. The LIABILITY provision, when read together as a whole, would render the Decedent liable to Plaintiff Danny Haire for her account activity, including removing his name as a joint owner, and would remove any liability on part of the Bank. Any liability the Decedent, or the estate, may have to Plaintiff Danny Haire

- 16 -

for the removal of his name as joint owner of the account is not, and has never been, before the Court in this litigation.

Ultimately, we agree with the trial court's decision to grant summary judgment on Mr. Haire's breach of contract claim. Our analysis, however, is slightly different from that of the trial court. *See Bobo*, 511 S.W.3d at 26 n.14; *Wood*, 901 S.W.2d at 378. The trial court relied heavily on the "Liability" provision quoted above; however, that provision is but one piece of the puzzle. Following a thorough review of the record, we conclude that the Bank was entitled to summary judgment for a number of reasons.

First, Mr. Haire asserted at the summary judgment stage that his breach of contract action lies based upon the signature cards he admittedly signed in 2008 and 2009. Nonetheless, those signature cards do not contain provisions supporting Mr. Haire's breach of contract claims. Specifically, the cards do not provide that the Bank was required to give Mr. Haire notice if Decedent removed him as an account owner, nor do the cards require the Bank to get Mr. Haire's consent for Decedent to remove him as an account owner. As such, even if we were to agree with Mr. Haire's contention that the signature cards alone contain the terms of Mr. Haire's contract with the Bank, the cards do not establish any duty breached by the Bank. In any event, the Bank established in its motion for summary judgment that the signature cards bind the signers to the terms of the Bank's depositor agreement. Importantly, Mr. Haire has not pointed to any provision, in any version of the depositor agreement, requiring the Bank to give a joint account owner notice if he or she is removed by another joint owner. Nor do the depositor agreements provide that one joint owner needs documented consent from another joint owner to take action related to an account. As the trial court noted, Mr. Haire as a joint owner appointed Decedent as his attorney-in-fact "for all matters involving the account[s]." This power included, but was not limited to, "receiving and giving notice, . . . pledging or entering separate agreements affecting the account[s], . . . appointing or removing additional signers, . . ." or "charging or terminating the account." As such, Decedent was allowed to remove Mr. Haire as a joint owner of, or even terminate altogether, either account. Such actions would not trigger a contractual obligation by the Bank to notify or obtain consent from Mr. Haire. On appeal, Mr. Haire has not pointed to anything in the record that suggests otherwise.

Additional provisions in the depositor agreements insulate the Bank from the type of contractual liability alleged by Mr. Haire. First, regarding POD accounts, "[t]he person(s) creating such an account may: (1) change beneficiaries, and (2) withdraw all or part of the account funds at any time." Accordingly, the depositor agreements expressly provide that Decedent was allowed to add Mr. Haire's siblings as POD beneficiaries at any point. There is nothing in this provision requiring notice to other account owners or other beneficiaries. Second, the depositor agreements provide, under a "Power of Attorney" provision, that the Bank "ha[s] no duty or agreement whatsoever to monitor or insure that

the acts of the agent are for [the account owner's] benefit." The same provision provides that account owners "agree not to hold [the Bank] responsible for any loss or damage [account owners] may incur as a result of [the Bank] following instructions given by an agent acting under a valid power of attorney." Here, several of the later signature cards with which Mr. Haire takes issue were executed by his siblings acting as Decedent's attorney-in-fact. On the record before us, the Bank had no reason to suspect such action was nefarious, and, as noted above, the Bank had no contractual duty to monitor such actions to ensure they were for Decedent's benefit.

To conclude, there is no language in either the signature cards or the depositor agreements suggesting that the Bank breached a contractual duty to Mr. Haire or Decedent. Rather, there are several provisions in the depositor agreements that, when taken together, protect the Bank from Mr. Haire's breach of contract claim. When the Bank made this argument at the summary judgment stage, Mr. Haire's response was not to point out contractual provisions requiring the Bank to give Mr. Haire the notice he claims he was due. *See Rye*, 477 S.W.3d at 265 (noting that in order to withstand a supported motion for summary judgment, "the nonmoving party 'may not rest upon the mere allegations or denials of [its] pleading,' but must respond, and by affidavits or one of the other means provided in Tennessee Rule 56, 'set forth specific facts' . . . 'showing that there is a genuine issue for trial.'" (quoting Tenn. R. Civ. P. 56.06)). Instead, Mr. Haire chose to die on the hill of which depositor agreement was in effect on which day. As addressed at length already, this point is inapposite under the particular circumstances of this case. There is no provision in any of the agreements requiring the Bank to do what Mr. Haire claims the Bank failed to do. Further, the relevant provisions discussed in our analysis are the same in each and every revised version of the Bank's depositor agreement.

Considering all of the foregoing, we agree with the trial court's conclusion that the Bank is entitled to summary judgment as to all of Mr. Haire's claims. Thus, we affirm the trial court.

## CONCLUSION

The ruling of the Chancery Court for Knox County is affirmed, and this case is remanded for proceedings consistent with this opinion. Costs on appeal are assessed to the appellant, Phillip Daniel Haire, individually and as personal representative of the Estate of Ella Mae Haire, for which execution may issue if necessary.

_____
KRISTI M. DAVIS, JUDGE